DIAMOND WINE & SPIRITS, INC., Appellee,

v.

DAYTON HEIDELBERG DISTRIBUTING CO., INC., Appellant;
C&G Distributing Company, Inc., Appellee.

[Cite as *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg
Distrib. Co., Inc.,* 148 Ohio App.3d 596, 2002-Ohio-3932.]

Court of Appeals of Ohio,
Third District, Allen County.

No. 1–01–153.

Decided Aug. 2, 2002.

David W. Alexander and Marc J. Kessler, for appellee.

Alfred J. Weisbrod and Dennis M. Fitzgerald, for appellant.

John M. Leahy, Roger Schantz and James F. Deleone, for third-party defendant-appellee.

WALTERS, Judge.

{¶ 1} Defendant–appellant, Dayton Heidelberg Distributing Co., Inc. ("Heidelberg"), brings this appeal from an Allen County Common Pleas Court decision granting summary judgment against it and dismissing its claims for misrepresentation, breach of contract-warranty, and indemnification against third-party defendant-appellee, C & G Distributing Company, Inc. ("C & G"). Upon review of the record, we find that Heidelberg's knowledge of circumstances surrounding the agreement and terms within the agreement preclude the company from claiming that it had been misled into signing the contract. We further find that a contract which purports to obligate a party to indemnify an actor against a civil action for intentional acts designed and calculated to accomplish the disruption, interference or destruction of a business relationship or contract violates public policy and is, therefore, unenforceable to that extent. Accordingly, we affirm the trial court's judgment.

{¶ 2} Facts and procedural history relevant to the issues raised on appeal are as follows. C & G distributed alcoholic beverages in Lima, Ohio, including various brands of beer and wine. In 1999, C & G decided to sell the wine division of its distribution business. By letters dated June 17, 1999, C & G authorized its counsel to solicit offers from two other alcoholic beverage distributors in the Lima area, Heidelberg and Diamond Wine & Spirits, Inc. ("Diamond"). Over the next several months Diamond and Heidelberg submitted competing bids for the distribution business. C & G eventually selected Diamond, whose $850,000 bid exceeded Heidelberg's $750,000 bid. Thereafter, C & G and Diamond negotiated the terms of an asset purchase agreement ("Diamond Agreement") by which the wine division would be sold. In November 1999, C & G forwarded an executed copy of the agreement to Diamond's counsel. Diamond's board of directors authorized its president to execute the agreement in December 1999.

{¶ 3} Under the terms of the Diamond Agreement, and in accordance with R.C. 1333.84(F), C & G was obligated to secure the prior consent of alcoholic beverage manufacturers to the transfer of its franchise right to distribute the manufacturers' products. However, the agreement specifically contemplated that some manufacturers would not consent to the transfer. A rebate provision in the agreement provided that in the event a manufacturer did not consent to the transfer, Diamond would be entitled to all gross profits earned from the sale of the licensed beverages or any amounts C & G received from any other party in exchange for the franchise within one year of the agreement.

{¶ 4} During the fall of 1999, C & G contacted its manufacturers to obtain their approval for the sale. Several manufacturers sent written confirmation that they were either consenting to or refusing to consent to the transfer. Represen-

tatives from one of the more lucrative manufacturers, Canandaigua Wine Company ("Canandaigua"), gave preliminary oral indications that consent would be forthcoming.

{¶ 5} Between August 1999 and January 2000, Heidelberg's principal, Vail Miller, aware of the fact that they were competing with Diamond for the franchise rights and having heard from a representative of Canandaigua that they were going to recommend that the company consent to a sale of the franchise to Diamond, contacted a principal in Canandaigua's New York office. Miller attempted to convince Canandaigua that Heidelberg would better serve the company's needs and offered incentives in hopes of obtaining their approval.

{¶ 6} On January 14, 2000, C & G and Diamond closed on the sale of C & G's wine division. Diamond forwarded a letter dated January 14, 2000, to C & G indicating that several manufacturers had not consented to the transfer, thereby invoking the rebate provision. Believing that Heidelberg was the likely recipient of the nonconsenting brands, Diamond advised C & G that "it was important that C & G and Diamond work together to see that Heidelberg pays a fair price to C & G for the lines that it is apparently going to obtain." Diamond subsequently received written notice from Canandaigua that it would not be consenting to the transfer.

{¶ 7} Thereafter, in February 2000, C & G and Heidelberg entered into an asset purchase agreement ("Heidelberg Agreement") for the sale of the distribution rights to the 11 manufacturers that had not consented to the Diamond transfer. In March 2000, Diamond executed a release in favor of C & G relating to the Diamond Agreement.

{¶ 8} On June 29, 2000, Diamond filed its complaint against Heidelberg and Canandaigua, claiming that Heidelberg had interfered with prospective economic advantage and contract, and that Canandaigua had unreasonably refused to consent to the transfer of the distribution franchise. Heidelberg responded thereto and filed a third-party complaint against C & G, asserting that C & G had misrepresented the nature of its relationship with and transfer of assets to Diamond, and that provisions in the Heidelberg Agreement entitled it to indemnification from C & G for costs and expenses incurred in defending itself against Diamond's claims.

{¶ 9} After deposing representatives of the companies involved, the parties submitted several competing summary judgment motions. On November 13, 2001, the trial court granted summary judgment in favor of C & G finding that (1) as a matter of law, the terms of the Heidelberg Agreement represented and warranted that there was another agreement involving Diamond, and (2) that the indemnification provision of the Heidelberg agreement was so self-contradictory as to preclude determination as to what was intended thereby. The instant

appeal followed, with Heidelberg presenting four assignments of error for our review. For purposes of brevity and clarity, we have elected to address the assigned errors out of the order in which they were presented.

### Second Assignment of Error

{¶ 10} "The trial court erred to prejudice of [Heidelberg] in finding as a matter of law C & G represented and warranted to Heidelberg that there was another agreement involving Diamond."

### Fourth Assignment of Error

{¶ 11} "The trial court erred to prejudice of [Heidelberg] in granting summary judgment based upon an issue never raised by movant nor argued by any party."

{¶ 12} It is well established under Ohio law that a court may not grant summary judgment unless the record demonstrates (1) that no genuine issue of material fact remains to be litigated, (2) that the moving party is entitled to judgment as a matter of law, and (3) that, after construing the evidence most strongly in the nonmovant's favor, reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made.[1] In ruling on a summary judgment motion, the trial court is not permitted to weigh evidence or choose among reasonable inferences; rather, the court must evaluate evidence, taking all permissible inferences and resolving questions of credibility in favor of the nonmovant.[2] Even the inferences to be drawn from the underlying facts contained in the evidentiary materials, such as affidavits and depositions, must be construed in a light most favorable to the adverse party.[3] Appellate review of summary judgment determinations is conducted on a de novo basis;[4] therefore, this court considers the motion independently and without deference to the trial court's findings.[5]

{¶ 13} As mentioned previously, Heidelberg set forth two claims for relief against C & G. First, Heidelberg claimed that C & G had misrepresented the

---

1. Civ.R. 56(C); *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 686–687, 653 N.E.2d 1196.

2. *Jacobs v. Racevskis* (1995), 105 Ohio App.3d 1, 7, 663 N.E.2d 653.

3. *Hannah v. Dayton Power & Light Co.* (1998), 82 Ohio St.3d 482, 485, 696 N.E.2d 1044.

4. *Griner v. Minster Bd. of Edn.* (1998), 128 Ohio App.3d 425, 430, 715 N.E.2d 226.

5. *J.A. Industries, Inc. v. All Am. Plastics, Inc.* (1999), 133 Ohio App.3d 76, 82, 726 N.E.2d 1066.

nature of its dealings with Diamond and that it had not entered into any other agreements for the sale of the assets subject to the Heidelberg Agreement, thereby breaching the contract and violating its warranty that the agreement does not conflict with any other agreement regarding the assets to be transferred thereunder. Heidelberg maintains that it was aware only that it had been competing with Diamond for the sale of the assets and that the Heidelberg Agreement involved the sale and transfer of less than all of C & G's assets. Claiming to be wary of the extremely competitive nature of the wine distribution business, Heidelberg asserts that it would not have completed the transaction or be involved in a lawsuit with Diamond had it known that C & G previously entered into an agreement with Diamond for the sale of the assets. Heidelberg's second claim for relief reincorporates its previous allegations and claims that if Diamond has a valid cause of action, it is entitled to indemnification from C & G for costs and expenses incurred in defending itself pursuant to the terms of the Heidelberg Agreement.

{¶ 14} C & G responded to Heidelberg's third-party complaint, asserting that company representatives had informed Heidelberg of the Diamond Agreement prior to entering into the Heidelberg Agreement and through other provisions within the agreement. In any event, C & G argues that Heidelberg is not entitled to indemnification for Diamond's claims because such claims are predicated upon the commission of an intentional tort, and public policy precludes enforcement of indemnification provisions to the extent that they purport to indemnify a party for their own intentionally tortious conduct. We proceed to address Heidelberg's claims in turn.

### Misrepresentation/Breach of Contract–Warranty

{¶ 15} Heidelberg's misrepresentation claim is tantamount to a claim that they were fraudulently induced to enter into the agreement with C & G. "In order to prove fraud in the inducement, a plaintiff must prove that the defendant made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to [its] detriment."[6] A person of ordinary mind cannot, however, be heard to say he was misled into signing a contract that was different from what he intended, when he knew or could have known the truth merely by reading what he signed.[7]

{¶ 16} Reviewing the terms of the agreement and construing the evidence from the transcripts in a light most favorable to Heidelberg, the trial court found

---

**6.** *ABM Farms, Inc. v. Woods* (1998), 81 Ohio St.3d 498, 502, 692 N.E.2d 574, citing *Beer v. Griffith* (1980), 61 Ohio St.2d 119, 123, 15 O.O.3d 157, 399 N.E.2d 1227.

**7.** *ABM Farms, Inc.*, 81 Ohio St.3d at 503, 692 N.E.2d 574.

that, as a matter of law, they had actual knowledge of the Diamond Agreement. Having examined the record herein, we agree. The Heidelberg Agreement is replete with references indicating that Diamond may have an interest in the proceeds from the sale of the assets subject to the transaction. Specifically, Section 3.6 states: "Seller further represents that Diamond may have an interest in this transaction as a result of previous negotiations with Diamond regarding the assets to be transferred hereunder." Moreover, section 2.2 directs that "[p]ayment shall be made to C & G Distributing Company, Inc. and Diamond Company, Inc. ("Diamond"). Because Seller represents that Diamond may have an interest in the proceeds of this transaction."

{¶ 17} Heidelberg attempts to argue that "negotiations" are distinguishable from the execution of an actual agreement for the sale of the assets; however, Diamond could not have had an interest in the proceeds from the sale of the assets subject to the Heidelberg Agreement without a contractual arrangement, and Vail Miller, cochairman of Heidelberg, admitted that he was aware that Diamond was attempting to purchase C & G's wine division no later than August or September 1999. Moreover, Miller further indicated that he had probably asked C & G what Diamond's interest was at the time the Heidelberg Agreement was executed, but was unable to recall whether they had explained it to him and was unable to offer an alternative explanation as to why they would have an interest in the proceeds.

{¶ 18} Considering the reference to Diamond's relationship with C & G, continued references to Diamond's interest in the proceeds from the sale of the assets, and the entirety of the language contained within the Heidelberg Agreement, we find it unreasonable to adopt an alternative interpretation: " 'Where the language of a contract * * * is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.' " [8] For the same reason, we find Heidelberg's contention that the terms within its agreement did not place it on notice of the existence of the Diamond Agreement equally unpersuasive. Thus, we find that there exists no genuine issue of material fact as to whether Heidelberg was induced into entering the agreement by C & G's alleged misrepresentation of its relationship with Diamond.

{¶ 19} Finally, Heidelberg asserts that the issue of whether terms within the Heidelberg Agreement placed the company on notice of the existence

---

8. *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 316, 667 N.E.2d 949, quoting *Stewart v. Chernicky* (1970), 439 Pa. 43, 49–50, 266 A.2d 259.

of the Diamond Agreement was not raised or argued by the parties in the proceedings below, arguing that the trial court erred in granting summary judgment based upon an issue never raised or argued by the parties during the underlying proceedings. However, " 'an entry of summary judgment against the moving party does not prejudice his due process rights where all relevant evidence is before the court, no genuine issue as to any material fact exists, and the non-moving party is entitled to judgment as a matter of law.' " [9] In the instant case, the issue of knowledge of the Diamond Agreement is implicit in the context of the issues raised on summary judgment: Heidelberg, in its pleadings before the trial court, fully discussed the issue of the company's knowledge of the agreement's existence and Diamond's relationship with C & G within the context of the terms of the Heidelberg Agreement. Moreover, Heidelberg does not claim that relevant, material evidence was not before the court. Therefore, we do not find that Heidelberg was prejudiced by the court's consideration and entry of summary judgment on those grounds. Accordingly, Heidelberg's second and fourth assignments of error are overruled.

### Indemnification

### First Assignment of Error

{¶ 20} "The trial court erred to prejudice of [Heidelberg] by finding as a matter of law that the cross claim of [Heidelberg] for indemnification against [C & G] should be dismissed and that C & G is dismissed from the case at cost to Heidelberg."

### Third Assignment of Error

{¶ 21} "The trial court erred to prejudice of [Heidelberg] in granting summary judgment in favor of C & G and against Heidelberg based upon a finding that § 3.6 of the asset purchase agreement between Heidelberg and C & G is so contradictory, that it is impossible to, as a matter of law, determine what was intended on the indemnification issue."

{¶ 22} Heidelberg's third-party complaint seeks indemnification from C & G for any judgment taken against Heidelberg and for costs incurred in defending against Diamond's claims of interference with prospective economic advantage and interference with contract. Reviewing the indemnification provision within the Heidelberg Agreement, the trial court concluded that self-contradictory terms contained therein precluded a determination as to what was intended by the

---

9. *State ex rel. Newell v. Cuyahoga Cty. Court of Common Pleas* (1997), 77 Ohio St.3d 269, 270, 673 N.E.2d 1299, fn. 1 quoting *State ex rel. Cuyahoga Cty. Hosp. v. Bur. of Workers' Comp.* (1986), 27 Ohio St.3d 25, 28, 27 OBR 442, 500 N.E.2d 1370.

provision. As a preliminary issue, we examine whether public policy permits the form of indemnification sought by Heidelberg.

{¶ 23} The tort of interference with business relationship occurs when a person, without privilege to do so, induces or otherwise purposefully causes a third person not to enter into or continue a business relationship with another.[10] The elements of tortious interference with a business relationship are (1) a business relationship, (2) the tortfeasor's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and, (4) damages resulting therefrom.[11] The main distinction between tortious interference with a contractual relationship and tortious interference with a business relationship is that interference with a business relationship includes intentional interference with prospective contractual relations, not yet reduced to a contract.[12] "[S]uch interference must be intentional because Ohio does not recognize negligent interference with a business relationship." [13]

{¶ 24} Ohio law, on public policy grounds, generally prohibits indemnification for damages caused by intentional torts.[14] Where, as here, the actor does something which brings about the exact result desired, i.e., intentional acts that are designed and calculated to accomplish the disruption, interference or destruction of the business relationship or contract, a contract purporting to obligate a party to indemnify the actor against a civil action for those intentional acts violates public policy, and is, therefore, unenforceable to that extent.[15]

{¶ 25} Therefore, because we find that public policy prohibits the form of indemnification sought by Heidelberg, we do not reach the indemnification terms of the agreement. While the trial court did not rely upon the aforementioned rationale to enter summary judgment in favor of C & G, a reviewing court is not authorized to reverse a correct judgment merely because different or erroneous

---

10. *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 14, 651 N.E.2d 1283.

11. *Geo–Pro Serv., Inc. v. Solar Testing Laboratories, Inc.* (2001), 145 Ohio App.3d 514, 525, 763 N.E.2d 664.

12. *Lapping v. HM Health Serv.* (Dec. 14, 2001), Trumbull App. No.2000–T–0061, 2001 WL 1602683.

13. *Bauer v. Commercial Aluminum Cookware Co.* (2000), 140 Ohio App.3d 193, 199, 746 N.E.2d 1173.

14. *Buckeye Union Ins. Co. v. New England Ins. Co.* (1999), 87 Ohio St.3d 280, 283, 720 N.E.2d 495.

15. Id.; *Burnham Shoes, Inc. v. West Am. Ins. Co.* (C.A.11, 1987), 813 F.2d 328, 329; *United Wats, Inc. v. Cincinnati Ins. Co.* (D.Kan.1997), 971 F.Supp. 1375, 1386.

reasons were assigned as a basis thereof.[16]   Accordingly, Heidelberg's first and third assignments of error are overruled.

{¶ 26}   Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, the decision of the Allen County Common Pleas Court is hereby affirmed.

Judgment affirmed.

SHAW, P.J., and THOMAS F. BRYANT, J., concur.

---

16.   *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 217, 222, 631 N.E.2d 150.