[Cite as *Simon Property Group, L.P. v. Kill* , 2010-Ohio-1492.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

SIMON PROPERTY GROUP, LP,                    CASE NO. 1-09-30

   PLAINTIFF-APPELLANT,

 v.

DEREK KILL, DBA D&D SPORTS                   **O P I N I O N**
CARDS & COLLECTIBLES,

   DEFENDANT-APPELLEE.

Appeal from Allen County Common Pleas Court
Trial Court No. CV 2007-1292

**Judgment Affirmed**

**Date of Decision:  April 5, 2010**

**APPEARANCES:**

   *Dale E. Bricker,* **Appellant**

   *Michael A. Rumer,* **for Appellee**

**WILLAMOWSKI, P.J.,**

{¶1} Plaintiff-Appellant, Simon Property Group, L.P. ("Simon Property" or "Simon") appeals the decision of the Allen County Court of Common Pleas in favor of Defendant-Appellee, Derek Kill dba D&D Sports Cards & Collectibles ("Derek"). Appellant contends that the trial court erred when it found that Simon Property had fraudulently induced Derek into executing a permanent lease at the Lima Mall and had otherwise violated the terms of the lease agreement. For the reasons set forth below, the judgment is affirmed.

{¶2} This case involves a landlord and tenant dispute between Derek, who was the sole proprietor of a sports merchandise and memorabilia store, and Simon Property, the landlord who operated the Lima Mall (or, "the mall") and leased retail space to Derek. From January 15 through December 31, 2006, Derek leased Room 926 at the mall under a "temporary lease." This lease was considered a temporary lease because, pursuant to its terms, Simon Property could elect to terminate it at any time upon thirty days notice. Derek's monthly rent was $1,400 for this 4,228 square foot space.

{¶3} In the fall of 2006, Simon Property told Derek that it was attempting to negotiate leases with some national tenants, including Champs Sporting Goods ("Champs"), in the section of the mall which included Room 926. Derek testified

that he was told that his temporary lease in Room 926 would not be renewed because Champs would be utilizing that space.

{¶4} Simon Property's senior leasing representative, Paul Katz ("Katz"), and Derek commenced talks regarding a permanent lease. Katz explained that rents for a permanent lease were higher because the tenant pays for the right to remain in the mall for a fixed term. On November 30, 2006, Derek entered into a five-year lease for Room 704, just diagonally across the hall from his former location. The lease was to commence in early 2007, after renovations were completed, and run for five years. Derek's monthly rent would be $5,288.37 for this 3,000[1] square foot retail space. Although the rent for this lease was much higher than the temporary lease, Derek believed that his business would greatly benefit from the increased traffic of young, sports-minded customers likely to be generated by the coming of Champs.

{¶5} The terms of the thirty-three page lease also provided for Simon Property to pay Derek up to $20,000 for "Permanent Improvements," such as alterations, renovations, improvements, and fixtures specified in lease section 24.21 ("tenant's allowance" or "TA".) Derek also specifically requested the inclusion of an exclusivity clause that would preclude Simon Property from

---

[1] Simon maintained that Derek's business's ideal space was 2,200 square feet, and that Derek's previous location in room 926, with over 4,000 square feet, was too big. Although Room 704 contained 3,000 square feet of floor area, Simon stated that, as a concession, it would only charge Derek at the rate for 2,500 square feet.

leasing space to any competing business selling similar merchandise.

{¶6} Soon thereafter, the parties began to have disputes over their respective rights and obligations under the lease. Derek claimed he made approximately $40,000 in improvements and renovations to the leased space prior to re-opening his business at the new location on March 9, 2007, but that Simon Property never paid him the tenant's allowance. Simon Property contended that Derek never provided the necessary paperwork in order to receive the reimbursement. Derek wanted Simon Property to apply the tenant's allowance to the rent he owed, and therefore, except for one $2,000 payment in November of 2007, Derek did not make any rent payments. Derek believed that he had been fraudulently induced into signing the new contract based upon the representation that Champs was definitely coming to the mall. Simon Property never finalized an agreement with Champs but insisted that no one had ever affirmatively represented that Champs was anything more than a prospective tenant. Simon Property maintained that the entire agreement between the parties was stated within the four corners of the lease agreement and that it was Derek who was in breach of the lease.

{¶7} Derek also complained that Simon Property leased space to two businesses that were in direct competition with him in violation of the exclusivity clause and that caused his holiday sales to fall drastically. Derek provided sales records that showed that his 2007 November and December holiday sales, which

accounted for 80% of his annual business, decreased by over $68,990 as compared to the previous year's 2006 November and December sales. Simon maintained that the two stores' primary business was not in competition with Derek and that Simon had not violated the terms of the exclusivity clause.

{¶8} On November 2, 2007, Simon Property served Derek with a notice to vacate and subsequently filed a forcible entry and detainer complaint against him in the Lima Municipal Court on November 27, 2007. Derek filed an answer and counterclaim in excess of the jurisdictional limits of the Lima Municipal Court. The case was transferred to the Allen County Court of Common Pleas and Simon Property amended its complaint to include a claim for unpaid rent, which amounted to $65,881.47 for the period from March 2007 through March 2008.[2]

{¶9} On April 30, 2009, a bench trial was held and the trial court heard conflicting testimony from the parties and their witnesses concerning the disputed claims and counterclaims. On May 18, 2009, the trial court entered its judgment finding that Simon Property had fraudulently induced Derek to enter into a new long-term lease agreement; that Simon Property failed to properly pay Derek the $20,000 tenant's allowance; and that Simon Property had breached the exclusivity agreement, thereby entitling Derek to damages.

{¶10} The trial court awarded Simon Property $13,400 in unpaid rent that

---

[2] Derek vacated the premises some time in early February 2008.

it would have been entitled to receive from Derek from March 8, 2007 to February 4, 2008, at the rental rate that had been in effect under the terms of the original temporary lease prior to Simon Property fraudulently inducing Derek to enter into the permanent lease agreement. The trial court found that Simon Property owed Derek $20,000 for the tenant allowance, from which Simon Property was to deduct $11,000 to pay directly to Varsity Contracting for the remodeling work it did for Derek. Finally, the trial court awarded $33,163.63[3] in damages to Derek for lost income due to Simon Property's breach of the exclusivity agreement, and one dollar for punitive damages. After off-setting the various judgments and awards, the trial court ordered Simon Property to pay Derek the sum of $28,673.63. It is from this judgment that Simon Property appeals, presenting the following six assignments of error for our review.

### First Assignment of Error

**The trial court erred when it found that [Simon Property] fraudulently induced [Derek] into executing a permanent lease on November 30, 2006 by falsely representing that Champs was not only coming in as a tenant at Lima Mall, but that it was a done deal.**

### Second Assignment of Error

**The trial court erred when it found Simon Property was estopped, under the doctrine of promissory estoppel, from claiming by the Lease that it had no obligation to pay for the Landlord Contribution towards the cost of Tenant's Work**

---

[3] This was based upon evidence that Derek's gross income was $68,990 less during November and December in 2007 than during the previous November and December in 2006, and that Derek's net profits were approximately 48%.

**(Tenant Allowance) set forth in Section 24.21 of the Lease and finding that Simon Property owes $20,000.00 to Derek for the Tenant Allowance less $11,000.00 due Derek's contractor, Varsity Contracting.**

### Third Assignment of Error

**The trial court erred when it found that Simon Property had violated the exclusive use set forth in Section 24.22 of the Lease.**

### Fourth Assignment of Error

**The trial court erred when it awarded damages for violation of the exclusive [sic].**

### Fifth Assignment of Error

**The trial court erred when it awarded Simon Property $13,400.00 for unpaid rent, based on the rent payable under a prior temporary lease, instead of the $68,881.47 claimed by Simon Property as rent due under the [new lease].**

### Sixth Assignment of Error

**The trial court erred when it awarded Derek $1.00 in punitive damages.**

Because several of the assignments of error address related issues, we shall review those issues together and out of order.

*First and Fifth Assignments of Error*

{¶11} In its first assignment of error, Simon Property maintains that the trial court erred in finding that Simon Property fraudulently induced Derek to enter into the permanent lease. Simon Property insists that it never told Derek that Champs was definitely going to be a tenant at the mall. Therefore, Derek should

have been held responsible for the full $68,881.47 rent due under the new, permanent lease. Simon contends that there is no competent, credible evidence of any false representation being made by Simon regarding Champs.

{¶12} Essentially, Simon is arguing that the trial court's decision finding fraudulent inducement was against the manifest weight of the evidence. In *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578, at the syllabus, the Ohio Supreme Court set forth the standard of review for civil manifest weight of the evidence cases, stating, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." See, also, *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, at ¶24 (reaffirming the standard set forth in C.E. Morris). An appellate court must "presume that the findings of the trier of fact are correct" since "the trial judge had an opportunity 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Wilson*, at ¶24, quoting *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80-81, 461 N.E.2d 1273. Reversal based on an error of law is legitimate; however, the trial court's decision should not be reversed based on a "difference of opinion on credibility of witnesses and evidence ***." Id., quoting *Seasons Coal*, at 81; *Knipp v. Sadler*, 3d Dist. No. 6-09-04, 2009-Ohio-4444, ¶7.

{¶13} In order to prove fraud in the inducement, a plaintiff must prove that the defendant made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to his or her detriment. *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 148 Ohio App.3d 596, 601, 2002-Ohio-3932, 774 N.E.2d 775, ¶15, citing *ABM Farms, Inc. v. Woods.*, 81 Ohio St.3d 498, 1998-Ohio-612, 692 N.E.2d 574.

{¶14} First however, before we discuss the evidence concerning the elements of fraudulent inducement, we must address a preliminary issue that Simon raises. Simon contends that because the lease contained an integration clause and the terms of the lease were clear and unambiguous, evidence of antecedent understandings and negotiations should not be admitted because of the parol evidence rule.

{¶15} An integration clause is essentially a contract's embodiment of the parol evidence rule, i.e., that matters occurring prior to or contemporaneous with the signing of a contract are merged into and superseded by the contract. *Galmish v. Cicchini*, 90 Ohio St.3d 22, 27-28, 2000-Ohio-7, 734 N.E.2d 782. "The parol evidence rule states that 'absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.'" *Rylee Ltd. v. Izzard Family Partnership*, 178 Ohio

App.3d 172, 2008-Ohio-4506, 897 N.E.2d 208, ¶6, quoting *Galmish v. Cicchini*.

However, the parol evidence rule does not prohibit a party from introducing parol

or extrinsic evidence for the purpose of proving fraudulent inducement. *Galmish*

*v. Cicchini*, 90 Ohio St.3d at 28. That is because the parol evidence rule does not

bar evidence of fraudulent inducement where the extrinsic evidence goes to the

*making* of the contract, not to a provision of that contract.

> **"[W]here one party to a contract has been induced to enter into it through fraud, deceit, and misrepresentation of the other party as to material matters, the defrauded party does not become bound by its terms, notwithstanding the contract contains a provision that there are no agreements or statements binding upon the parties except those contained therein. Fraud which enters into the actual making of a contract cannot be excluded from the reach of the law by any formal phrase inserted in the contract itself."**

*Niehaus v. Haven Park West, Inc.* (1981), 2 Ohio App.3d 24, 25, 440 N.E.2d 584,

citing *Sparhawk v. Gorham* (1956), 101 Ohio App. 362, 139 N.E.2d 652.

{¶16} In this case, the representations concerning the coming of Champs

and the reasons why Derek had to vacate his location were not matters that were

embodied in the contract. These were issues that were extrinsic to the contract and

parol evidence was admissible to show the reasons why Derek was fraudulently

induced into signing the new agreement.

{¶17} Specifically, the elements of fraudulent inducement are: (1) an

actual or implied false representation concerning a fact or, where there is a duty to

disclose, concealment of a fact, (2) which is material to the transaction; (3)

knowledge of the falsity of the representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred; (4) intent to induce reliance on the representation; (5) justifiable reliance; and (6) injury proximately caused by the reliance. See *Info. Leasing Corp. v. Chambers*, 152 Ohio App. 3d 715, 2003-Ohio-2670, 789 N.E.2d 1155. See, also, *Gaines v. Preterm-Cleveland, Inc*. (1987), 33 Ohio St.3d 54, 55, 514 N.E.2d 709. Fraudulent inducement must be proven by clear and convincing evidence. *Mid-America Tire, Inc. v. PTZ Trading Ltd.*, 95 Ohio St.3d 367, 2002-Ohio-2427, 768 N.E.2d 619, ¶62.

**{¶18}** Simon argues that there was no fraudulent inducement because: (A) Simon did not make any false representations; (B) there was no reliance by Derek; and, (C) there was no resulting injury or damages.

**{¶19}** First, Simon argues that it never made any false representations. Katz testified that he would never have told anyone that the Champs lease was a "done deal" unless they had a signed contract. However, Katz also testified repeatedly that his "recollection" was unsure because "it was so long ago," and acknowledged that Simon did "thousands of leases" every year. Derek, on the other hand, testified that he very clearly remembered that he was told "'*** you're going to have to go permanent because *** Champs is taking your space.'" (Trial Tr. p. 96.) Further testimony by Derek stated:

> **Q:** **When did you first think about changing from a temporary lease to a permanent lease?**

**A:     It would have been sometime during the summer of '06 when I was approached being told that I could no longer stay at the current space I'm at because it was being filled by Champs."**

(Trial Tr. p. 95.)  Derek testified that he was told this on more than one occasion by both the mall manager and Katz.  He also submitted a floor plan of the mall with the names of the stores listed in each location (Exhibit E).  The wording "PROPOSED CHAMPS" is listed in space 926.  However, the word "proposed" appears to be crossed out. Derek testified that he specifically remembered the blueprint being laid in front of him many times and that Katz crossed out the word "proposed" when explaining what was going to happen at the mall.[4]  (Trial Tr. pp. 164-69.)  Katz testified that he didn't specifically recall the meeting with the floorplans, and believed that the word was not actually crossed out, but that it was just a "sloppy circle" drawn around the store's name.

{¶20} Another tenant at the mall, Cheryl Walters ("Walters"), owner of the Amish Merchant, also testified concerning her experiences with Katz and his attempts to change her temporary lease to a permanent lease.  In the summer of 2006, Ms. Walters had been leasing space 736 under a temporary lease.  Katz told her that Borders Book Store would be taking over several of the lease spaces,

---

[4]On appeal, Simon raises the issue for the first time that Derek's testimony was not credible because the date on the floorplan exhibit had a revision date of "January 9, 2007" – several months after the lease was signed.  However, Simon did not question Derek or Katz about this at trial when Simon would have had the opportunity to try to impeach Derek's testimony.  Furthermore, Derek specifically testified that he remembered conversations with Katz and the blueprint "many times," so it is entirely possible that the same scenario took place with an earlier version of the floorplan prior to the lease being signed.  And finally, even without the floorplan, there was sufficient evidence for the trial court to find that there was fraudulent inducement.

including 736, and that she would have to relocate to room 914 and sign a permanent lease. She refused to sign a new lease until such time as she was actually going to be "bumped" for Borders. She requested that Katz provide her with a document in writing stating Borders was coming and she would have to leave. Katz never did, so she remained in room 736 with her temporary lease. Ms. Walters also testified that Katz and the mall manager mentioned other national stores might be coming in, but Katz said "that was years down the road." She did not recall him ever mentioning Champs.

{¶21} About a year later, Walters was again requested to move across the hall and sign a permanent lease, this time was because Old Navy was going to move to her location from the other end of the mall. Once again, she asked for something in writing that she was going to be bumped out of her present location but Katz never produced anything. At the time of the trial, Ms. Walters' business still remained in room 736, operating for more than eight years with a temporary lease.

{¶22} Simon also argues that fraud cannot be predicated upon promises or representations relating to future actions or conduct because such representations are regarded as predictions and are not fraudulent. See, e.g., *Tibbs V. national Homes Constr. Corp.* (1977), 52 Ohio App.2d 281, 369 N.E.2d 1218. Although Katz was very careful to testify he never stated directly to Derek that Simon had an officially signed lease agreement with Champs, Katz did admit that he "would

say they were in negotiations or that it might be looking good." (Trial Tr. p. 200.) Derek testified that "I was told specifically that [Champs] was taking my space." (Id., at p. 149.) These are not future events as argued by Simon, but rather misrepresentations of present events that Simon made directly to Derek in order to induce Derek to execute the new lease.

{¶23} After weighing all of the testimony and evidence before it, the trial court made the following conclusions and holdings:

> **The Court finds that [Derek] was assured by [Katz] that CHAMPS was not only coming in, but that it was a done deal. This was not a future event, it was a present event. The Court finds credible [Derek's] testimony that Katz had marked out the word "proposed" on Exhibit E. This was important to [Derek]. Katz testified that he did not remember marking out "proposed" but [Derek] specifically remembers. The court deems [Derek's] testimony credible, taken in light of similar representations made to Cheryl Walters at Amish Merchant.**

(Judgment Entry, p. 9.)

{¶24} The trial court found Derek's and Ms. Walters's testimony to be more credible than Katz's, and it is not for a reviewing court to weigh the credibility of the witnesses. There was sufficient competent and credible evidence presented at trial to support the finding that Simon Property had falsely represented material facts to Derek.

{¶25} Next, Simon Property claims that there was no justifiable reliance upon any representation regarding Champs. Simon asserts Derek signed the permanent lease because his temporary lease was about to expire. Simon also

argues Derek should have requested a provision in the lease that Champs would be a co-tenant if Champ's presence was so important.

**{¶26}** Whether or not the reliance was justified under the facts of the case is a question for the trier of fact. *Rucker v. Everen Securities, Inc.*, 102 Ohio St.3d 1247, 2004-Ohio-3719, 811 N.E.2d 1141, at paragraph 7. The trial court made the following findings of fact:

> **A major instrumental reason for [Derek] entering a Permanent Agreement was that CHAMPS, a major tenant selling youth sports shoes and clothing, would be moving in across the hall from him which would assist in his business \*\*\*.**

**{¶27}** Again, the record demonstrates that there was considerable evidence before the trial court indicating that Derek only signed the permanent lease because he was told he had no other choice and that he had to vacate his temporary lease location to provide space for Champs. As the testimony of Ms. Walters demonstrated, there was apparently no reason why he could not have renewed his temporary lease and remained in his old location. We agree that it might have been prudent for Derek to have asked Katz to put the representations concerning Champs in writing, as Ms. Walters did. Unfortunately, Derek was young and had considerably less business experience than Ms. Walters. That does not in any way change the fact that Derek relied upon the many verbal representations of the official representatives of Simon Property. Derek testified that "if Champs didn't come I would never have signed the lease." (Trial Tr. p. 112.)

{¶28} And finally, Simon argues that Derek was not damaged by relying upon Simon's representation. There is considerable testimony in the record that refutes this contention. Derek testified that he was operating a profitable business at his old location. By moving, he was giving up approximately one thousand square feet of floor space and increasing his rent $3,888.34 per month. These are negative factors for a retail business. He had counted on being able to recoup the additional costs because he expected an increase in traffic from young consumers drawn to the area by Champs. Ms. Walters also testified how she would have expected increased business if the representations concerning the coming of Borders and Old Navy had been true.

{¶29} The trial court ruled that this increase in rent was a damage Derek sustained as a direct and proximate result of Simon's fraudulent inducement. In other words, but for the fraudulent inducement, Derek would have continued to operate his business in room 926 and would not have become indebted to Simon for the amount set forth in the new lease. The trial court, therefore, ordered Derek to pay back rent to Simon, but under the rate of the prior temporary lease, rather than the new lease. The trial court's decision placed Derek in the same position he would have been if Simon had not fraudulently induced him into signing the new lease agreement.

{¶30} A party who has been fraudulently induced to enter into a contract has the option of rescinding the contract or seeking damages based upon the tort of

fraudulent inducement. *Mid-America Acceptance Co. v. Lightle* (1989), 63 Ohio App.3d 590, 599-600, 579 N.E.2d 721. In this case, the trial court did not err when it ruled that Derek was not obligated to pay the increased rent owing under the new lease.

**{¶31}** There was sufficient competent and credible evidence in the record for the trial court to have found that Simon fraudulently induced Derek to sign the new lease, and the trial court did not err when it ruled that Derek was not responsible for the higher lease payments due under that lease. Simon's first and fifth assignments of error are overruled

*Second Assignment of Error*

**{¶32}** In the second assignment of error, Simon contends that the trial court erred when it ruled that Simon must pay the $20,000 tenant's allowance. Simon argues that it was not obligated to pay the TA because Derek failed to submit the proper paperwork and comply with the conditions specified in the lease. Specifically, Simon argues that Derek did not pay all of his contractor bills; he did not furnish the requested Tenant's Affidavit of Payment; and he failed to obtain the required lien waivers.

**{¶33}** While the evidence confirmed that Derek did not comply with all of the specific conditions set forth in section 24.21 of the lease, the trial court found that Derek was entitled to reimbursement under the doctrine of promissory estoppel. The trial court made the following conclusions and holding:

-17-

**The Court further finds that as to the "tenant reimbursement allowance" that there were oral communications and clear and unambiguous promises and reliance by [Derek] to whom the promises were made. All of the elements of promissory estoppel have been met by clear and convincing evidence and Simon is estopped from claiming by the contract that it has no obligation to pay for the tenant reimbursement allowance. In this instance, promissory estoppel does not contravene the parol evidence rule. [Derek] proceeded with the remodeling and right to the tenant reimbursement allowance, relying upon the promissory statements, assurances and representations by Simon, its agents, managers and employees that show sufficient commitment to induce reasonable reliance by [Derek.] This is a question of fact and the Court finds that the reliance by [Derek] was objectively reasonable and foreseeable.**

(Judgment Entry, p. 10.)

{¶34} Promissory estoppel is a quasi-contractual or equitable doctrine. *Dailey v. Craigmyle & Son Farms, L.L.C.*, 177 Ohio App.3d 439, 2008-Ohio-4034, 894 N.E.2d 1301, ¶14. Promissory estoppel encompasses a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee, does induce such action or forbearance and is binding if injuries can be avoided only by enforcement of the promise. *McCroskey v. State* (1983), 8 Ohio St.3d 29, 30, 456 N.E.2d 1204. Whether a clear and unambiguous promise is made is a question of fact. *Dailey v. Craigmyle & Son Farms,* 2008-Ohio-4034, at ¶14.

{¶35} First, Simon again argues that even if the elements of promissory estoppel can be proven by oral testimony at trial, that evidence should not be admissible because of the parol evidence rule. However, this is another instance

-18-

in which the parol evidence rule is not applicable because a claim based on promissory estoppel does not necessarily contravene the parol evidence rule. Promissory estoppel is an equitable doctrine for enforcing the right to rely on promises. See *Karnes v. Doctors Hosp.* (1990), 51 Ohio St.3d 139, 142, 555 N.E.2d 280. It is based on the principles of good faith, equity, and conscience. *Rucker v. Everen Securities, Inc.*, 102 Ohio St.3d 1247, 811 N.E.2d 11412004-Ohio-3719, ¶6, (Francis E. Sweeney, Sr., J., dissenting), citing Eric Mills Holmes, *The Four Phases of Promissory Estoppel* (1996), 20 Seattle U.L.Rev. 45, 64. The issue presented herein is not a contradiction of the written contract but goes to the post-contract actions of Simon and Varsity relative to the tenant allowance.

{¶36} Derek testified that he contracted with Varsity Contractors ("Varsity") to do $11,000 of remodeling, and he also contracted with additional contractors and vendors for total improvements in excess of $20,000. When Derek attempted to obtain reimbursement, he was constantly told different things that he needed to do by at least four or five different people within the Simon Property organization. Each time he attempted to comply with the reimbursement requirements, he was passed along to another person or the requirements changed. He testified that he provided receipts to Simon but he was not able to obtain lien waivers because they were inapplicable to most of the expenses and Varsity testified that it did not provide lien waivers for its work. Derek testified that he paid all of his contractors except Varsity, but that he had an agreement with

Varsity to pay them after he received the TA. Therefore, couldn't submit an affidavit of payment, a condition of being paid, until he was paid – a "catch-22" situation.

{¶37} Brian Tierney ("Tierney") was Operations Manager for Varsity, but he had previously been a Simon employee and was again directly working for Simon at the time of trial. Tierney testified that Varsity did a lot of work for Simon, including compliance inspections. Tierney could hold up payment of a TA until he gave his approval and had done so with Derek for a period of time. When the trial court questioned Tierney to clarify the relationship between Simon Property and Varsity, the court asked, "They're in bed together?" and Tierney acknowledged, "Yes." (Trial Tr. p. 86.)

{¶38} Derek also testified to accidently receiving an email forwarded by Katz stating that "I'm just trying to keep this tenant from getting evicted here. Anita, this tenant has gotten misinformation from Third Works, the mall staff, and even Bryan Zupan for months and the delays in his tenant allowance has contributed to his delinquency." (Trial Tr. p. 140-141; Def.'s Ex. M.) Katz was also confronted on cross examination with his prior deposition testimony where he had stated "this is crazy evicting you for sort of a sequence of circumstances where our own Varsity people sort of screwed up getting the lien waivers done." (Trial Tr. p. 232.)

{¶39} We find that there was sufficient clear and convincing evidence to support the trial court's finding that Simon was obligated to pay the $20,000 tenant allowance. Simon Property's second assignment of error is overruled.

*Third and Fourth Assignments of Error*

{¶40} Simon Property contends that it did not violate the terms of the exclusive use clause of the lease and that the trial court erred when it awarded Derek damages. Simon acknowledges that it temporarily leased space to Artistic Creations (room 926, Derek's former location) and an unnamed holiday kiosk near Derek's store, from October through December during the 2007 Christmas season. However, Simon maintains that the "primary use" of those businesses did not involve selling items similar to Derek's merchandise. And, even if the exclusive use clause was violated, Simon insists that Derek's sole remedy was termination of the lease, not monetary damages.

{¶41} It was extremely important to Derek that he had the exclusive right to sell sports memorabilia and collectibles and he insisted that Simon include an exclusivity clause in the lease agreement. Simon agreed and its attorneys drafted Lease Section 24.22, Exclusive, which stated in part:

> **Except for Excluded Tenants \*\*\*, provided Tenant is not in default under this Lease and is operating for business in the Premises for the Permitted Use, landlord shall not during the Lease Term lease any other space in the enclosed mall portion of the Center to another tenant whose primary use is the retail sale of sports and celebrity memorabilia and sports collectibles ("Competing Use"). Subject to the foregoing, if Landlord does**

**lease other space in the enclosed mall portion of the Center for the Competing Use and fails to cure such violation within thirty (30) days after written notice from Tenant, then Tenant shall have the right to terminate this Lease on sixty 60) days written notice to Landlord. \*\*\* Tenant acknowledges and agrees that the foregoing remedy is Tenant's sole and exclusive remedy arising out of or as a result of Landlord's violation of this Section. \*\*\***

{¶42} Katz testified that Derek notified him "a couple of times" that the exclusivity clause was being violated, and he acknowledged that Artistic Creations was selling "some Ohio State clocks and posters," like Derek was. However, Katz and the mall manager did not believe that there was a direct infringement of the exclusivity clause because they felt that the sale of this type of merchandise was not the stores' "primary use." The term "primary use" was not defined anywhere in the lease agreement, but Katz testified that he believed it meant somewhere in the range of "seventy-five, eighty, eighty-five percent" of the business.[5]

{¶43} It is a long-standing rule of contract construction that any ambiguity in a contract shall be construed against the drafter. See, e.g., *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶49. This is especially true in cases such as this when the parties do not have equal bargaining power or experience. See *Cline v. Rose* (1994), 96 Ohio App.3d 611, 614, 645 N.E.2d 806. The terms and purpose of this contract clause clearly meant

---

[5] There was also testimony demonstrating that the two parties had a very different idea as to what type of merchandise constituted "sports and celebrity memorabilia and sports collectibles."

something different to each party and the term "primary use" was unquestionably ambiguous.

{¶44} The uncontroverted testimony and exhibits presented by Derek established that at least two mall tenants were selling products in direct competition with his merchandise. One exhibit was a photograph showing a holiday kiosk selling the same signs and clocks that Derek sold and another photo showed the Artistic Creations store's front window full of competing products.

{¶45} The trial court noted in its judgment entry that there was no specified percentage defining "primary use" anywhere in the lease agreement and it stated that Katz appeared to be making up numbers as he testified. The trial court found that "[b]y common sense and the exhibits, it is clear that [Simon] had violated the exclusive clause." (Judgment Entry p. 11.) The totality of the evidence supports the trial court's ruling that Simon breached the exclusivity clause of the lease.

{¶46} We also do not find any merit in Simon's argument that the trial court should not have enforced the exclusivity clause because Derek was delinquent in his rent payments. The record shows Derek and Simon were in constant negotiations regarding payment of the tenant allowance and using that money as a set off to the back rent owed. The trial court did not err in finding that Simon violated the exclusivity clause.

{¶47} As to the issue of damages, Simon argues that Derek was not entitled to monetary damages because the exclusivity clause specified the only remedy

available. The trial court found that the remedy provided for in the lease was "essentially irrelevant" in that Derek's sole option was to terminate the lease and vacate the premises. Terminating the lease and giving up his business location and the investment he made in improvements would not provide any benefit or remedy to Derek. Derek argues that the remedies clause is unenforceable because it fails of its essential purpose.

{¶48} Furthermore, Derek did not have even *that* option available because Simon made the determination that no breach had occurred. And, if Simon would have acknowledged violating the exclusivity agreement, Derek would have had to wait a minimum of ninety days after giving notice of the breach to vacate, during which time he would have continued to lose revenue during the critical holiday season which represented eighty percent of his annual income. Or, if Simon would have asked the competitors to leave, by the time the issue was resolved, the holiday season would have been over and Derek would still have suffered a loss of business. The trial court found that the remedy available to Derek under the lease provided no remedy at all.

{¶49} We agree that the exclusivity clause and the remedies provided were illusory and provided no benefit or remedy to Derek. This clause was drafted by Simon's attorney, and therefore, must be construed against the drafter and in favor of Derek. An agreement is illusory where "by its terms the promisor retains an unlimited right to determine the nature or extent of his performance; the unlimited

-24-

right, in effect, destroys his promise and thus makes it merely illusory." *Imbrogno v. Mimrx.com, Inc.*, 10th Dist. No. 03AP-345, 2003-Ohio-6108, ¶8, citing *Century 21 v. McIntyre* (1980), 68 Ohio App.2d 126, 427 N.E.2d 534. See, also, *MedCorp, Inc. v. Mercy Health Partners*, 6th Dist. No. L-08-1227, 2009-Ohio-988, ¶18. As noted above, Simon retained the ability to determine whether or not its actions constituted a violation of the exclusivity clause, and, even if it would have acknowledged a breach, the remedies in the clause did not provide any benefit to Derek. In fact, the clause provided a vehicle for Simon to force a termination of the lease, if it chose to do so.

{¶50} The trial court determined that Simon had breached the exclusivity clause. The trial court then provided a remedy that served to make Derek whole. There was sufficient competent and credible evidence in the record that Derek's gross sales decreased by approximately $70,000 from 2006 to 2007 when Simon breached the exclusivity clause. The trial court stated:

> **Further, the Court finds that [Derek's] income and profits and losses for October, November and December were way off from previous years and that this, the court finds, was not speculation. [Derek] had been in the business. He had other businesses in other malls in Ohio and had the records to prove the loss.**

(Judgment Entry, p. 11.)

{¶51} The trial court did not err when it ordered Simon to pay damages to Derek to compensate him for the profits he lost as a direct result of the two stores

-25-

selling competing products in violation of the exclusivity clause. Based on all of the above, Simon's third and fourth assignments error are overruled.

*Sixth Assignment of Error*

**{¶52}** In the final assignment of error, Simon Property asserts that the trial court erred in awarding one dollar in punitive damages. Simon claims that a charge of actual malice is essential to the allowance of punitive damages and no charge of actual malice was made in this case.

**{¶53}** Simon cites *Pickle v. Swinehart* (1960), 170 Ohio St. 441, 443, 166 N.E.2d 227, for the proposition that "actual malice" is an essential element to an award of punitive damages. However, that is an inaccurate representation of the law. In the section Simon quotes from *Pickle v. Swinehart,* the Ohio Supreme Court was merely examining the difference between "actual malice" and "legal malice." Actual malice is only one of several elements that may give rise to an award of punitive damages.

> **In an action to recover damages for a tort which involves the ingredients of *fraud, malice, or insult*, a jury may go beyond the rule of mere compensation to the party aggrieved, and award exemplary or punitive damages \*\*\*. (Emphasis added.)**

*Zappitelli v. Miller*, 114 Ohio St.3d 102, 2007-Ohio-3251, 868 N.E.2d 968, ¶4, quoting *Roberts v. Mason* (1859), 10 Ohio St. 277, paragraph one of the syllabus. See, also, *Mabry-Wright v. Zlotnik*, 165 Ohio App.3d 1, 2005-Ohio-5619, 844

N.E.2d 858, ¶19; *Manyard v. Eaton Corp.*, 3d Dist. No. No. 9-03-48, 2004-Ohio-3025, ¶16.

{¶54} Fraudulent or negligent misrepresentations and fraudulent inducements are all valid tort claims and can lead to both compensatory damages and punitive damages. *Curran v. Vincent*, 175 Ohio App.3d 146, 2007-Ohio-3680, 885 N.E.2d 964, ¶20. In this case, there was a clear claim of fraud against Simon for the fraudulent representations made to induce Derek to enter into the new lease. The trial court did not err in awarding punitive damages. Simon's sixth and final assignment of error is overruled.

{¶55} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, J., concurs.**

**ROGERS, J., dissents.**

**/jnc**