[Cite as *E.J. Zeller, Inc. v. Auto Owners Ins. Co.*, 2014-Ohio-4994.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## DEFIANCE COUNTY

**E.J. ZELLER, INC. ET AL.,**

    **PLAINTIFFS-APPELLANTS,**           **CASE NO. 4-14-04**

    **v.**

**AUTO OWNERS INSURANCE**
**COMPANY, ET AL.,**                  **O P I N I O N**

    **DEFENDANTS-APPELLEES.**

**Appeal from Defiance County Common Pleas Court**
**Trial Court No. 12-CV-42075**

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision: November 10, 2014**

**APPEARANCES:**

    *Marc F. Warncke* **for Appellants**

    *Gordon D. Arnold and Patrick J. Janis* **for Appellees**

**ROGERS, J.**

{¶1} Plaintiffs-Appellants, E.J. Zeller, Inc. ("Zeller") and City Rentals, Inc. ("CRI"), appeal the judgment of the Court of Common Pleas of Defiance County granting summary judgment in favor of Defendants-Appellees Auto Owners Insurance Company and Owners Insurance Company (collectively "Auto Owners"). On appeal, CRI argues that the trial court erred by applying the incorrect limit of insurance to its claims. Zeller and CRI also argue that the trial court misinterpreted the underlying insurance contracts when granting summary judgment for Auto Owners. For the reasons that follow, we affirm in part and reverse in part the trial court's judgment.

{¶2} On June 16, 2003, Zeller purchased a Tailored Protection Policy from Owners Insurance Company which contained several different sections that provided coverage for different losses, each with different premium amounts. (Docket No. 4, Motion for Summary Judgment in Case 10 CV 40798 ("Summary Judgment Motion"), Exhibit M, p. 1).[1] Two different sections under the Tailored Protection Policy covered acts of employee dishonesty. The Property Plus Coverage included an endorsement entitled Employee Dishonesty ("Property Endorsement"). The endorsement extended coverage to losses caused by

---

[1] A declaratory judgment action commenced prior to the action in the case sub judice. While the prior case was dismissed without prejudice, the attachments to the summary judgment motion filed by Auto Owners were made a part of the record in this case. (*See* Docket No. 4, p. 1). While the summary judgment motion, its attachments and its exhibits are all a part of the record, they do not have independent docket numbers. Therefore, we refer to any of the materials attached to the summary judgment motion by the journal entry in the docket that made them a part of the record in this case.

employee dishonesty up to a limit of $10,000. Additionally, the Tailored Protection Policy included Commercial Crime Coverage. An Employee Dishonesty Coverage Form ("Crime Endorsement")[2] was part of the Commercial Crime Coverage, and included additional coverage for loss caused by employee dishonesty up to a limit of $50,000. The policy period began at 12:01 AM on August 12, 2003, and ended at 12:01 AM on August 12, 2004. Zeller purchased similar policies in each successive year covering all periods through August 12, 2009. Each policy was categorized as a renewal, each new policy period began on August 12 at 12:01 AM in the year of the expiring prior policy period, and each policy period ended on August 12, 12:01 AM the following year. The declarations for the Commercial Crime Coverage stated that acceptance of the next year's coverage was notice that the prior year's coverage had been cancelled.

{¶3} On April 22, 2005, CRI purchased a similar Tailored Protection Policy from Auto Owners Insurance Company which also contained coverage under several different sections with different premium amounts that were similar to the Zeller policy. The Property Plus Coverage in the policy included the same Property Endorsement contained in the policies purchased by Zeller, which extended coverage to losses caused by employee dishonesty up to a limit of $10,000. Commercial Crime Coverage, identical to the coverage in the Zeller

---

[2] We note, for the sake of clarity, that the Employee Dishonesty Coverage Form does not state that it is an endorsement to the policy. We refer to it as an endorsement because it adds coverage for employee dishonesty to the commercial crime coverage.

policies, contained the same Crime Endorsement that provided additional coverage for losses caused by employee dishonesty up to a limit of $50,000. CRI's policy period began at 12:01 AM on June 10, 2005 and ended at 12:01 AM on June 10, 2006, and the Commercial Crime Coverage specifically stated that acceptance of the current year's coverage cancelled the prior year's coverage.

**{¶4}** On June 10, 2006, CRI renewed the policy with similar terms. On June 10, 2007, CRI again renewed the policy, but discontinued the Commercial Crime Coverage, which resulted in a discontinuation of the additional $50,000 coverage for employee dishonesty. The policy continued to include the Property Endorsement for employee dishonesty up to a limit of $10,000. On June 10, 2008, CRI renewed the policy, increasing the limit of insurance in the Property Endorsement for employee dishonesty from $10,000 to $15,000. Each policy was categorized as a renewal.

**{¶5}** Robin Bauer was a bookkeeper for Zeller. She began working in the same capacity for CRI in 2005. Over the course of her employment with both companies, she embezzled substantial amounts, which was discovered on August 8, 2008. She was subsequently fired by both companies, and Auto Owners was informed of the loss on August 11, 2008. After investigating the claims of both companies, Auto Owners ultimately paid $60,000 in benefits under the policy issued to Zeller and $15,000 under the policy issued to CRI, representing the

maximum allowed under the limits of insurance contained in the current policies for each company.

{¶6} Zeller and CRI filed for declaratory judgment in the Court of Common Pleas of Defiance County on September 13, 2012, claiming that Auto Owners was required to pay up to the limit of insurance under each policy in effect over the course of Bauer's embezzlement. Auto Owners filed a motion for summary judgment on January 14, 2013, claiming that Zeller and CRI were only entitled to payment up to the limit of insurance under the current policy. Cross motions for summary judgment were filed by both Zeller and CRI, claiming that the policies were unclear and ambiguous, requiring that the contract be interpreted to allow them to make claims against each policy in effect during the time when Bauer was embezzling money. On December 30, 2013, the trial court granted summary judgment in favor of Auto Owners, finding that the policies clearly and unambiguously limited Zeller and CRI to a single recovery under the current policy, and dismissed the claims.

{¶7} It is from this judgment Zeller and CRI filed this timely appeal, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED IN FAILING TO HOLD THAT CRI IS ENTITLED TO A MINIMUM OF $45,000 OF ADDITIONAL COVERAGE, BECAUSE THE "PRIOR LOSS' [SIC] PROVISION OF THE POLICY MAKES THE COVERAGE LIMIT APPLICABLE TO THIS**

**"OCCURRENCE" $60,000, RATHER THAN $15,000 AS THE DEFENDANTS CLAIM.**

*Assignment of Error No. II*

**THE COURT ERRED WHEN IT LIMITED BOTH PLAINTIFFS TO A SINGLE YEAR'S POLICY LIMIT, BECAUSE A FAIR READING OF THE DEFINITION OF "OCCURRENCE," THE "PRIOR LOSS," "NON-CUMULATION" AND "DISCOVERY OF LOSS" PROVISIONS OF THE POLICIES SHOWS THEM TO BE UNCLEAR, AMBIGUOUS, AND SUSCEPTIBLE TO MORE THAN ONE INTERPRETATION, WHEN APPLIED IN THE CONTEXT OF A LARGE LOSS COMMITTED BY THE SAME EMPLOYEE OVER SEVERAL YEARS.**

{¶8} Due to the nature of the assignments of error, we elect to address them out of order.

*Assignment of Error No. II*

{¶9} In their second assignment of error, Zeller and CRI argue that the trial court erred when it limited their recovery to the current policy. We agree.

*A. Standard of Review*

{¶10} An appellate court reviews a summary judgment order de novo. *Hillyer v. State Farm Mut. Auto. Ins. Co.*, 131 Ohio App.3d 172, 175 (8th Dist.1999). Accordingly, a reviewing court will not reverse an otherwise correct judgment merely because the lower court utilized different or erroneous reasons as the basis for its determination. *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 148 Ohio App.3d 596, 2002-Ohio-3932, ¶ 25 (3d Dist.), citing *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d

217, 222 (1994). Summary judgment is appropriate when, looking at the evidence as a whole: (1) there is no genuine issue as to any material fact, and (2) the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). In conducting this analysis the court must determine "that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, [the nonmoving] party being entitled to have the evidence or stipulation construed most strongly in the [nonmoving] party's favor." *Id.* If any doubts exist, the issue must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 359 (1992).

{¶11} The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). In doing so, the moving party is not required to produce any affirmative evidence, but must identify those portions of the record which "affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims." *Id.* at 293. The nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; the nonmoving party may not rest on the mere allegations or denials contained in the pleadings. *Id.*; Civ.R. 56(E).

*B. Interpretation of Insurance Policies*

{¶12} Initially, we note that how employee dishonesty coverage operates when losses caused by embezzlement span multiple policy periods is a question of

Case No. 4-14-04

first impression in Ohio. The parties brought this to the attention of this court, and we have been unable to find any relevant Ohio case law. Numerous cases in other jurisdictions have come to opposite conclusions as to how similar policies operate to cover losses that span multiple policy years. *Compare Adolf Jewelers, Inc. v. Jewelers Mut. Ins. Co.,* 614 F.Supp.2d 648, 654-655 (E.D. Vir.2008) (finding insured could make claims against multiple policies) *with Wausau Business Ins. Co. v. U.S. Motels Management, Inc.*, 341 F.Supp.2d 1180, 1183-1184 (D.Col.2004) (finding insured was limited to recovering under most recent policy). However, as these cases are merely persuasive, we must determine how the policy operates under Ohio law.

{¶13} "An insurance policy is a contract, and its interpretation is a matter of law for the court." *Allstate Ins. Co. v. Eyster*, 189 Ohio App.3d 640, 2010-Ohio-3673, ¶ 17 (3d Dist.), citing *Sharonville v. Am. Emp. Ins. Co.*, 109 Ohio St.3d 186, 2006-Ohio-2180, ¶ 6. "The starting point for determining the scope of coverage is the language of the insurance policies." *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 7. "The coverage under an insurance policy is determined by construing the contract 'in conformity with the intention of the parties as gathered from the ordinary and commonly understood meaning of the language employed.' " *Eyster* at ¶ 17, quoting *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 211 (1988). An insurance policy must be examined "as a whole and [with the presumption] that the intent of the parties is

-8-

reflected in the language used in the policy." *Westfield v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, ¶ 11.

{¶14} As the Ohio Supreme Court has noted, "[i]f it is reasonable to do so, we must give effect to each provision of [an insurance contract]." *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 115 Ohio St.3d 306, 2007-Ohio-4917, ¶ 17. Provisions should not " 'be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible.' " *Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St.3d 163, 167 (1984), quoting *German Fire Ins. Co. v. Roost*, 55 Ohio St. 581 (1897), paragraph one of the syllabus. Insurance policies should be "enforced in accordance with their terms as are other written contracts." *Rhoades v. Equitable Life Assur. Soc. of the U.S.*, 54 Ohio St.2d 45, 47 (1978).

{¶15} While terms in an insurance contract are to be given their plain and ordinary meaning, any ambiguity is construed against the insurer. *Lager v. Miller-Gonzalez*, 120 Ohio St.3d 47, 2008-Ohio-4838, ¶ 15. However, "[a]mbiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Id.* at ¶ 16. "Where the provisions of the policy are clear and unambiguous, courts cannot enlarge the contract by implication so as to embrace an object distinct from that originally contemplated by the parties." *Rhoades* at 47. Further, courts cannot construe ambiguity in favor of the insured where it results in "an unreasonable interpretation of the words of the policy." *CPS Holdings, Inc.*, at ¶ 8.

{¶16} The trial court found that "the policy terms, 'occurrence', 'discovery of loss', 'prior loss', and 'non cumulation' taken individually and together * * * [are] clear, unambiguous and not reasonably subject to misunderstanding." (Docket No. 21, p. 4). In applying these terms, the trial court found that Auto Owners was only required to pay up to the limits of insurance in the most recent policy year. In essence, these terms resulted in the current policy excluding coverage under any prior policy. However, the trial court did not explain its analysis as to how these different provisions operated to exclude coverage.[3] Zeller and CRI argue that the terms relied on by the trial court are ambiguous as to whether they operate, either individually or combined, to result in the current policy excluding coverage under all prior policies, and as such must be read in their favor. As the insurance policy operates as a whole, we will discuss each of the provisions utilized by the trial court in its determination in the context of how the endorsements provide coverage.

---

[3] The trial court relied upon its own prior decision of *Stykemain-Pontiac-Buick GMC Ltd. V. Motorists Mutual Ins. Co.*, Defiance C.P. No. 08-CV-39170 (Mar. 23, 2012), which became a part of the record as an attachment to Auto Owners' summary judgment motion. (Docket No. 8, Exhibit S). At oral argument, Auto Owners stated that any lack of analysis in the current case can be remedied by looking to the judgment entry in the prior case. However, the prior judgment also failed to definitively analyze the policies. While the *Stykemain* decision discusses the arguments of the insured and insurer, it does not analyze the language of the actual provisions of the policy. Indeed, the actual language of the policy provisions does not even appear in the judgment entry, only the same shorthand descriptors utilized in the case sub judice. Further, the trial court in *Stykemain*, while noting that Auto Owners provided arguments as amici curia, did not specify which authorities it relied on or why it was adopting their reasoning. Instead, the *Stykemain* court stated that it would "not reiterate here the various citations and analysis but acknowledges the persuasiveness of the various authorities." (*Id.* at p. 6). It goes on to state that none of the provisions are ambiguous without explaining how they operate. There is otherwise no independent analysis of the policies or any reference to any authority in either judgment entry.

*C. Exclusions*

**{¶17}** While the provisions utilized by the trial court were not specifically titled exclusions in the policy, it nevertheless found that they limited recovery to the current policy. In essence, the trial court found that the terms in the most current policy operated to exclude coverage under any prior policy. As the Ohio Supreme Court has noted, "an exclusion in an insurance policy will be interpreted as applying only to that which is *clearly* intended to be excluded." (Emphasis sic.) *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 64 Ohio St.3d 657, 665 (1992). An insurer "must demonstrate that the [exclusion] in the policy is capable of the construction [the insurer] seeks to give it, and such construction is the only one that can be fairly placed upon the language." *Bosserman Aviation Equip., Inc. v. U.S. Liab. Ins. Co.*, 183 Ohio App.3d 29, 2009-Ohio-2526, ¶ 11 (3d Dist). Therefore, for Zeller and CRI to be limited to recovering under their most current policies, we must find that the policies clearly exclude recovery under any other prior policy.

**{¶18}** Before discussing how the exclusions operate, our analysis requires a determination as to whether there were separate policies for each year that Bauer embezzled or whether there existed a single, continuous contract over the entire period of her embezzlement. Zeller and CRI argue that they should be allowed to make claims against each insurance policy in effect over the course of Bauer's misconduct, which would require a finding of separate contracts. Auto Owners

argues that the provisions operate to limit recovery to the most recent policy "[w]hether there is one insurance contract over several years, or separate successive yearly contracts * * *." Appellee's Br., p. 3. However, Auto Owners' interpretation belies the fact that many of the provisions only operate when *prior* policies are involved. Were we to find one continuous contract, there would be no prior policies, as the policy period of the first contract would not have ended but been extended. Therefore, because it affects the rest of our analysis, we must first determine whether the insurance policies are separate contracts or one long continuous contract.

{¶19} "Generally, the renewal of an insurance policy represents a separate and distinct contract." *Francis v. McClandish*, 4th Dist. Athens No. 98CA21, 1999 WL 266680, *7 (April 19, 1999), citing Russ & Segalla, *Couch on Insurance,* Section 29.33 (3d Ed.1997). The language of the instrument itself determines whether a renewal is a new contract or the continuation of an old contract. *Dixon v. Professional Staff Mgt.*, 10th Dist. Franklin No. 01AP-1332, 2002-Ohio-4493, ¶ 25. Other courts have found that where the policy period has a definite beginning and end and the coverage only applies to acts within the policy period, a renewal creates a separate contract. *See Dixon* at ¶ 27; *McClandish* at *8. However, even where a policy period has definitive beginning and ending dates, if the terms specify that the policy period is part of a larger guaranteed period of coverage, then each renewal forms a part of a single, continuous

contract. *Townsend v. State Farm Mut. Auto Ins. Co.*, 6th Dist. Sandusky No. S-97-059, 1998 WL 484537, *4 (Aug. 14, 1998). As the Ohio Supreme Court has noted:

> [A] contract containing a renewal option constitutes a present grant only for the original term, and a new contract must be executed at the end of such term if the option to renew is to be exercised. On the other hand, a contract which may be characterized as one containing an option to extend an agreement constitutes a present grant which, upon exercise of the option, operates to extend the term of the original agreement and the contract then becomes one for both the original and extended term.

*State ex rel Preston v. Ferguson*, 170 Ohio St. 450, 457-458 (1960).

{¶20} Here, there are several factors that weigh in favor of finding that the renewals created new contracts for insurance. The policy period of each contract lasted for one year and had definitive beginning and ending dates and times. (*E.g.*, Summary Judgment Motion, Exhibit I, Tailored Protection Policy Declarations, p. 1).[4] The declarations for the Commercial Crime Coverage specifically state that "[b]y Acceptance [sic] of this fidelity bond you give us notice cancelling prior fidelity bond the cancellation to be effective at the time this policy becomes effective." (*Id.* at p. 19).

{¶21} Further, the Crime General Provisions, which affect the Crime Endorsement, state that the policy would "pay only for loss that you sustain

---

[4] We note that, while appearing on different pages in the specific policies, the language of the employee dishonesty provisions was the same in all of the contracts between both companies. We therefore elect to use the page numbers provided for the specific provisions, instead of noting the page numbers for each specific policy.

-13-

through acts committed or events occurring during the Policy Period." (*E.g.*, Summary Judgment Motion, Exhibit I, Crime General Provisions ("Crime General Provisions"), p. 3). The Property Endorsement contained an identical provision. (*E.g.*, Summary Judgment Motion, Exhibit I, Employee Dishonesty Endorsement ("Property Endorsement"), p. 4). Nothing states that the policy period is part of a larger grant of coverage, nor does anything in the contract specify that a renewal extends the terms of the original contract. As a result, we find that each renewal of the policy created a separate and distinct contract of insurance.

{¶22} We next turn to the provisions of the contracts to determine whether they operate to exclude coverage under prior policies.

*1. Occurrence*

{¶23} The term "occurrence" is found in the definition section for each endorsement, which states:

> **"Occurrence"** means all loss caused by, or involving one or more "employees", whether the result of a single act or series of acts.

(Boldface sic.) (Property Endorsement, p. 6; Summary Judgment Motion, Exhibit I, Employee Dishonesty Coverage Form ("Crime Endorsement"), p. 2). As a defined term, "occurrence" is not an exclusion from coverage. Therefore, standing alone, the term does nothing to exclude coverage under prior policies.

{¶24} However, what losses are attributable to an "occurrence" has an impact on how other exclusions operate. The grant of coverage in the Property Endorsement states:

**A.  COVERAGE**

We will pay for loss involving Covered Instruments[5] resulting directly from the Covered Cause of Loss.

1. **Covered Property:** "Money", "securities", and "property other than money and securities".

2. **Covered Cause of Loss:** "Employee Dishonesty".

(Boldface sic.) (Property Endorsement, p. 1). The Crime Endorsement states:

**A.  COVERAGE**

We will pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss.

1. **Covered Property:** "Money", "securities", and "property other than money and securities".

2. **Covered Cause of Loss:** "Employee Dishonesty".

(Boldface sic.) (Crime Endorsement, p. 1). For each endorsement, each act of employee dishonesty creates an individual loss. The term "occurrence" is used to aggregate these individual losses together.

{¶25} When determining which individual losses are aggregated together, other courts have determined that an "occurrence" that covers "all loss" includes losses caused by employee dishonesty that were covered under prior policies,

---

[5] While the endorsement states that it will pay for loss to covered instruments, it then defines covered "property." This appears to be a clerical error and does not affect our analysis.

independent of whether that loss is otherwise excluded under the current policy. *See Employers Mut. Cas. Co. v. DGG & CAR, Inc.*, 218 Ariz. 262, 264-265 (2008) (analyzing "occurrence" independently and finding recovery was limited to the limits of a single policy); *Glaser v. Hartford Cas. Ins. Co.*, 364 F.Supp.2d 529, 538 (D.Md.2005) (performing a similar analysis and reaching a similar conclusion, but determining that recovery was not limited to a single policy).[6] However, whether the term "occurrence" has any effect on prohibiting recovery under multiple policies is dependent upon how the term is used. Indeed, were the term not used at all in the rest of the policy, any analysis of the term would be irrelevant to determining coverage. How much loss is included in an "occurrence" will depend upon how it is used in a specific provision. Therefore, we will analyze what losses are encompassed by the term by discussing its presence, or absence, in the other provisions.

## 2. Policy Period

{¶26} While not addressed by the trial court, each endorsement contains an identical provision entitled Policy Period. They state:

**Policy Period**

a.    The Policy Period is shown in the [Declarations.]

---

[6] At least one court has made a determination on whether recovery was limited to a single policy independent of analyzing the loss included in an "occurrence." *Emcor Group, Inc. v. Great Amer. Ins. Co.*, D.Md. No. ELH-12-142, 2013 WL 1315029, *20-21 (Mar. 27, 2013).

      b.    Subject to the Loss Sustained During Prior Insurance condition, we will pay only for loss that you sustain through acts committed or events occurring during the Policy Period.

(Boldface sic.) (Property Endorsement, p. 4; Crime General Provisions, p. 3). This provision excludes any loss caused by acts of employee dishonesty outside the policy period from coverage. Thus, losses attributable to acts that occurred during prior policy periods would not be covered under the current policy. However, this provision does not clearly state that *coverage* under prior policies for those losses is excluded by the current policy. It is merely a limit of coverage under the current policy.

### 3. Discovery of Loss

{¶27} For a loss to be covered under either the Property Endorsement or the Crime Endorsement, it must be discovered within a certain time. Both are affected by an identical provision, which states:

**Discovery Period for Loss:** We will pay only for covered loss discovered no later than one year from the end of the policy period.

(Boldface sic.) (Crime General Provisions, p. 2; Property Endorsement, p. 2). This creates a temporal limit as to when a loss must be discovered. The Discovery Period for Loss limits recovery under any one policy to those losses discovered within one year after the policy period ends. Thus, this provision excludes recovery for any loss that would otherwise be covered if it is discovered outside the time period.

{¶28} However, this provision does not cause the *current* policy to exclude coverage under *prior* policies. Instead, it is merely a time limit for when losses caused by acts in the current policy period must be discovered to trigger coverage. The provision acts as an expiration date for the insurer's liability under each policy. Losses caused by acts inside the policy period which are discovered while the policy is still in effect, or in the year immediately after the policy period ended, are still covered. However, once a year has passed, the policy coverage expires and can no longer provide any coverage for any losses. Thus, while this provision in the current policy does nothing to limit recovery under prior policies, coverage can be defeated under a prior policy, so long as it contains this provision and losses were not discovered within one year after the end of the respective policy periods.

### 4. Prior Loss

{¶29} Each endorsement contains the following provision:

**Loss Covered Under This Insurance and Prior Insurance Issued by Us or Any Affiliate:** If any loss is covered:

a.    Partly by this insurance; and

b.    Partly by any prior canceled or terminated insurance that we or any affiliate had issued to you or any predecessor in interest;

the most we will pay is the larger amount of the amount recoverable under this insurance or the prior insurance.

(Boldface sic.) (Crime General Provisions, p. 3; Property Plus Coverage, p. 3-4). This provision specifically limits coverage for an individual loss that is covered under two policy periods. However, as discussed, each policy only covers losses caused by acts that occur inside of the policy period. Any loss attributable to acts that occur solely outside the policy period are automatically excluded under each policy. Thus, this provision cannot apply to an individual loss attributable only to acts inside the policy period of a single policy, as that loss will only be covered by one policy. Instead, this provision applies when acts occurring in two separate policy periods contribute to an individual loss. Under those circumstances, this exclusion would allow the insured to have the benefit of whichever policy provided greater coverage for that individual loss, but not be allowed to claim that loss under two different policies periods.

{¶30} Notably, this provision does not utilize the term "occurrence." It applies to individual losses, not to an aggregation of losses. Indeed, were this provision to apply when an "occurrence" was partly covered by two policies, then an occurrence would necessarily include losses covered under prior policies. However, as this provision is written, it only applies when a *loss* spans multiple policy periods. Thus, while this provision limits recovery for an individual loss that spans multiple policy periods, it does not otherwise exclude coverage under prior policies that are attributable to acts that occurred solely during that policy period.

## 5. *Non-Cumulation*

Both endorsements contain identical provisions, which state:

**Non-Cumulation of Limit of Insurance:** Regardless of the number of years this insurance remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

(Boldface sic.) (Property Endorsement, p. 4, Crime General Provisions, p. 3). Unlike the other provisions discussed, this provision specifically applies to multiple policies. However, it does not operate to exclude coverage under prior policies. This provision is specifically limited to "this insurance." While "this insurance" is not defined in the policy, when it is used elsewhere it is only in reference to the current policy, not to all policies issued by the insurers. Indeed, the Prior Loss exclusion operates when a loss was covered under "this insurance" and any prior insurance issued by the insurers. Thus, the definition of the term "this insurance" *cannot include any prior insurance*. As a result, the Non-Cumulation provision only operates in the event that "this insurance," i.e. the current policy, is extended or otherwise covers multiple years. When each policy period is covered by a different contract for insurance, this exclusion does nothing to limit recovery to a single policy.

{¶31} While this appears to result in a complete disregard for this provision when single year policies are involved, the exclusion has meaning in the context of the entire insurance contract. This provision is inside an endorsement. The

endorsement is subject to the provisions and declarations of the underlying insurance contract. The endorsement does not contain many of the essential terms of the contract, such as the actual amount of the limit of insurance, the duration of the policy period, or the amount or number of premiums paid. This provision makes clear that no matter how those provisions are defined elsewhere in the policy, the limits of insurance in the endorsement in the *current policy* do not stack from year to year. Further, if the current policy is extended instead of renewed, the limit of insurance would remain the same. This provision cannot operate to limit recovery under prior policies because the language clearly does not apply to prior policies.

**{¶32}** However, even if we were to find that this provision affects prior insurance policies, the result would not change. This provision does not allow the *limits of insurance* to cumulate from year to year or period to period to enlarge the recovery under the current policy. Cumulate is defined as:

1:  to gather or pile up into a heap: heap together: accumulate

2a:  to combine (as votes, law actions, or penalties) into one, *specif*.:
to combine (the entries of preceding issues) in successive issues (as of an index or catalogue

b:  to enlarge by addition of new material.

*Webster's Third New International Dictionary* 553 (2002). Thus the Non-Cumulation provision prohibits the adding together of the limit of insurance in a different policy to the limit of insurance in the current policy to increase recovery

*under the current policy.* Where separate recoveries are sought from separate policies, the limits of insurance are not added together. Instead, there are multiple recoveries up to the limits of insurance under each policy. This is a cumulation of *recoveries*, not the cumulation of the *limit of insurance*. As a result, this exclusion does not limit recovery to a single policy.

### 6. *Limit of Insurance*

**{¶33}** Each endorsement contains a Limit of Insurance. The Crime Endorsement states:

> **LIMIT OF INSURANCE**
>
> The most we will pay for loss in any one "occurrence" is the applicable Limit of Insurance shown in the Declarations.

(Boldface sic.) (Crime Endorsement, p. 1). The Property Endorsement states:

> **LIMIT OF INSURANCE**
>
> The most we will pay for loss in any one "occurrence" is the Limit of Insurance shown in the Declarations for EMPLOYEE DISHONESTY.

(Boldface sic.) (Property Endorsement, p. 2). This provision utilizes the term "occurrence." While an occurrence covers "all loss," it only includes losses to which the provision otherwise applies. The limit of insurance is the only way to limit liability for losses *that are otherwise covered.* Only when the final amount of *covered loss* has been determined will the limits of insurance apply to determine the extent of the insurance company's liability under the policy. Thus,

only those losses that are otherwise covered are grouped into an "occurrence" for the purposes of this exclusion. Losses that have been excluded from coverage by other provisions are not a part of the "occurrence" because they create no liability that needs to be limited.

{¶34} As discussed, any loss that is caused by acts outside the policy period, and any loss caused by acts within the policy period but discovered more than one year from the end of the policy period, are otherwise excluded from coverage under each policy. Therefore, those losses cannot be part of the "occurrence" under the Limit of Insurance for that policy. As the Limit of Insurance only applies to an "occurrence," it does nothing to limit coverage for any losses that are not a part of an "occurrence" under that policy. The Limit of Insurance operates only to define the extent of liability for losses that are otherwise covered under the policy. There is no need to limit liability for losses that are otherwise already excluded from coverage. Those losses may be covered under a different policy up to that policy's Limit of Insurance.

### D. Summary of Coverage

{¶35} As none of these provisions on their own limit the recovery of Zeller or CRI to a single policy year, they cannot accomplish the same collectively. The policies are clear and unambiguous. Each policy issued by Auto Owners was a new, separate policy of insurance. While there is no recovery under a policy that ended more than one year before a loss was discovered, no exclusion otherwise

-23-

limits recovery to a single policy.[7]  Insofar as the trial court found that the current policy excluded recovery under any other policy, it was incorrect.  However, the Discovery Period of Loss operates to eliminate coverage under any policy that ended more than one year before August 8, 2008, which is when Bauer's embezzlement was discovered.  Thus, Zeller can seek coverage under the policy in effect from August 12, 2006, until August 12, 2007, as the loss was discovered within a year after the policy period ended.  And, of course, Zeller can seek coverage under the policy in effect from August 12, 2007, until August 12, 2008, which is the policy in effect when the loss was discovered.[8]

{¶36} CRI can seek coverage under the policy in effect from June 10, 2007, until June 10, 2008, as the loss was discovered within one year after the policy period ended, as well as the policy in effect from June 10, 2008, until June 10, 2009, which is the policy in effect when the loss was discovered. For any other policy, summary judgment was proper.  It remains to be determined which losses can be attributable to acts inside each policy period.

---

[7] We stress again that under Ohio law, an exclusion must be clear and unambiguous to defeat coverage. That Auto Owners had to point to multiple policy provisions in its attempt to prove the exclusion existed, instead of pointing to a provision that clearly states that the current policy excludes coverage under any prior policy,  is further evidence that the exclusion is not a part of the policy.

[8] Zeller provided information that there may be some loss attributable to acts inside the policy period from August 12, 2008, until August 12, 2009.  If true, that policy would also be triggered.  However, it is the August 8, 2008 discovery that sets the period to determine if any prior policies have been triggered.  Thus, any additional loss after this date does not alter our conclusion that the 2006-2007 policy and the 2007-2008 policy are also triggered.

{¶37} Accordingly, Zeller's and CRI's second assignment of error is sustained as to the two most recent policies and overruled for all other prior policies. (*But see* fn. 8)

*Assignment of Error No. I*

{¶38} The first assignment of error applies only to CRI, which argues that the trial court erred in determining the correct Limit of Insurance for Bauer's misconduct. CRI argues that the prior loss provision allows them to reap the benefit of a higher limit of insurance found in a prior policy.[9] We disagree.

{¶39} The Prior Loss provision, discussed above, applies when a loss is partly covered by two insurance policies issued by Auto Owners. From a factual perspective, there is nothing in the record as to whether an individual loss is attributable to acts that occurred both during the 2007-2008 policy, and the 2006-2007 policy period which had an additional $50,000 in employee dishonesty coverage. However, even assuming that a loss is partly covered under both policies, the Prior Loss provision requires Auto Owners to pay "the larger of the amount *recoverable* under this insurance or the prior insurance." (Emphasis added.) (Property Endorsement, p. 4). The Discovery of Loss provision precludes recovery for a loss discovered after one year from the end of the policy period. The 2006-2007 policy is outside of the Discovery of Loss period. Thus, the

---

[9] We note that this argument is not moot by determination of the second assignment of error. As we have been tasked with determining as a matter of law how the policy provisions interact with one another, and as the trial court must now determine the loss attributable to acts inside of each policy year, we must determine which limits of insurance apply.

amount recoverable under the 2006-2007 policy is zero. As a result, the trial court correctly found that CRI is not entitled to the higher amount of coverage found in the 2006-2007 policy.

**{¶40}** Accordingly, CRI's first assignment of error is overruled.

**{¶41}** Having found error no error prejudicial to CRI in the first assignment of error, but having found error prejudicial to Zeller and CRI in the second assignment of error, we affirm in part and reverse in part the trial court's judgment and remand the matter for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part, and*
*Cause Remanded*

**WILLAMOWSKI, P.J. and PRESTON, J., concur.**

**/jlr**