[Cite as *Zeller v. Farmers Group, Inc.*, 2019-Ohio-3297.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| JOHN ZELLER, et al. | : | |
| | : | |
| Plaintiffs-Appellants | : | Appellate Case No. 28013 |
| | : | |
| v. | : | Trial Court Case No. 2013-CV-5566 |
| | : | |
| FARMERS GROUP, INC., et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 16th day of August, 2019.

. . . . . . . . . .

GILBERT J. GRADISAR, Atty. Reg. No. 0021782 and JOHN M. GONZALES, Atty. Reg. No. 0038664, 501 S. High Street, Columbus, Ohio 43215
    Attorneys for Plaintiffs-Appellants

MELVIN D. WEINSTEIN, Atty. Reg. No. 0012174, and LORIANN E. FUHRER, Atty. Reg. No. 0068037, 65 E. State Street, Suite 1800, Columbus, Ohio 43215
    Attorneys for Defendants-Appellees

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Plaintiffs-appellants, Andrew Baker, David Boevington, Alisa Boles, Temma Crismond, Rochell Graeber, John Haldeman, Bradley Huey, Glenn Kamphaus, Gerald Marshall, Joseph Mullins, Jason Roberts and Allison Runnells, appeal from the trial court's entry of final judgment on May 9, 2018, in favor of Defendants-appellees, Farmers Group, Inc., Farmers Insurance Exchange, Farmers Insurance Group, Inc., Farmers New World Life Insurance Co., Fire Insurance Exchange, Mid-Century Insurance Co., Truck Insurance Exchange, and 21st Century Insurance. Raising six assignments of error, Appellants argue that the trial court erred by dismissing their claims for fraudulent inducement, breach of contract and violation of R.C. Chapter 1334; by entering judgment in favor of Appellees on their counterclaims against Appellants; and by striking Appellants' attempt to dismiss their claims without prejudice under Civ.R. 41(A).

{¶ 2} We find that the trial court erred by dismissing the claims of Appellants for fraudulent inducement to the extent that the claims were based on the allegations in Paragraphs 77(b)-(d) of Appellants' amended complaint. Otherwise, we find that the trial court did not err by dismissing Appellants' claims for breach of contract, by dismissing Appellants' claims for Appellees' alleged violations of R.C. Chapter 1334, or by entering judgment in favor of Appellees on their counterclaims against Appellants. Additionally, we find, as we have previously, that the trial court did not err by striking Appellants' attempt to dismiss their claims under Civ.R. 41(A).

## I. Facts and Procedural History

{¶ 3} Appellants allege that "[in] or before 2011," Appellees implemented a system in Ohio to promote the opening of agencies for the sale of Appellees' insurance products.

*See* Amended Complaint ¶ 1-2 and 73, Nov. 19, 2014. Referring to the system as the "Agency Point Program," Appellants allege further that it was presented to them as a three-year curriculum in which "person[s] would [be] train[ed] and [receive] support, including a monthly subsidy, to open [their] own insurance agenc[ies]" as independent business owners. *Id.* at ¶ 73. Appellees "admit that [they] opened Agency Points in Ohio in or before 2011," but they otherwise deny the foregoing allegations. *See* Answer to Amended Complaint ¶ 1-2 and 73, Dec. 30, 2014; *see also* Appellees' Brief 1-6.

{¶ 4} Appellants claim that they were among "approximately 400 [prospective] agents" whom Appellees "aggressively recruited, solicited and induced" to enroll in the program. Amended Complaint ¶ 3 and 74. As "part of the recruitment and solicitation," Appellants accuse Appellees of "knowingly ma[king] material representations [about the program] that were false." *Id.* at ¶ 75.

{¶ 5} To participate, each of the appellants executed a pair of contracts—the "Agent Appointment Agreement" (the "AAA") and the "Horizontal Marketing Agent Relationship Agreement" (the "HMARA"), though the parties make no express reference to the HMARA in the pleadings.[1] *See id.* at ¶ 1-101; Answer to Amended Complaint ¶ 1-14 and Exhibits 2, 4-8 and 15; *see also* Defendants' Motion to Dismiss, Exhibits 5, 12, 14, 22 and 24, Nov. 13, 2013. According to Appellants, the program was thereafter unilaterally terminated by Appellees in October 2012. Amended Complaint ¶ 78. Appellees deny this allegation, averring that they "reorganiz[ed] [their] Ohio agency force"

---

[1] For sake of clarity, we generally refer to the two agreements in the singular, as if Appellants jointly executed both of them, although each of the appellants individually executed a copy of the AAA and a copy of the HMARA. Answer to Amended Complaint, Exhibits 2, 4-8 and 15; Defendants' Motion to Dismiss, Exhibits 5, 12, 14, 22 and 24.

and simply reassigned agents who formerly "work[ed] through * * * Agency Point office[s]." *See* Answer to Amended Complaint ¶ 78.

{¶ 6} Thirty-four agents filed a complaint on September 16, 2013, identifying Appellees, two individual defendants, and 100 John Does as the defendants.[2] The agents presented causes of action for fraudulent inducement, breach of contract, tortious interference with business, unjust enrichment, civil conspiracy, and violations of R.C. Chapter 1334.[3]

{¶ 7} Appellees and the two individual defendants moved for dismissal of the complaint under Civ.R. 12(B)(6) on November 13, 2013. Before the trial court issued a decision on this motion, however, the agents moved for leave to file an amended complaint, and in advance of the trial court's ruling, the parties submitted a joint entry on April 9, 2014, stipulating that the pending motion to dismiss would apply to the amended complaint, if the trial court granted leave. On May 7, 2014, the trial court sustained the agents' motion for leave, and the agents thereafter filed their amended complaint on November 19, 2014. The amended complaint joined 27 additional agents as plaintiffs; the causes of action were substantively unchanged.[4]

{¶ 8} On December 2, 2014, the trial court sustained Appellees' motion to dismiss

---

[2] The John Doe defendants were unnamed agents, employees, independent contractors or managers associated with Appellees.

[3] R.C. Chapter 1334 governs business opportunity plans. Pursuant to R.C. 1334.01(D), a "business opportunity plan" is "an agreement in which a purchaser obtains the right to offer, sell, or distribute goods or services under all" of a series of conditions set forth in R.C. 1334.01(D)(1)-(3).

[4] The original complaint and the amended complaint also named Zurich Insurance Company as a defendant, but it was not made a party to the case because the attempt at service of process was unsuccessful.

in part and overruled the motion in part. Sustaining the motion in part, the court dismissed the claims of all of the agents for civil conspiracy; the claims of all of the agents for tortious interference with business; the claims of all of the agents for breach of contract against two of the appellees and the two individual defendants; and "the unjust enrichment claims of the 34 original [p]laintiffs" against six of the appellees. Decision, Order and Entry on Defendants' First Motion to Dismiss 10, 13, 15-16, 18-20 and 23, Dec. 2, 2014. Otherwise, the court overruled the motion. *Id.*

{¶ 9} The agents then attempted to dismiss the balance of their claims, filing a notice of voluntary dismissal under Civ.R. 41(A) on December 22, 2014. Appellees moved to strike the notice in reliance on precedent represented by the Ohio Supreme Court's opinion in *Pattison v. W.W. Grainger, Inc.*, 120 Ohio St.3d 142, 2008-Ohio-5276, 897 N.E.2d 126. In its opinion, the Court held: "[W]hen a plaintiff has asserted [several] claims against one defendant, and some of those claims have been ruled upon but not converted into a final order through Civ.R. 54(B), the plaintiff may not create a final order by voluntarily dismissing [the remaining claims] pursuant to Civ.R. 41(A)." *Pattison* at ¶ 1.

{¶ 10} On December 30, 2014, Appellees filed their answer to the amended complaint, with which they included four counterclaims. Of these, the first is relevant to the instant appeal—a claim for breach of contract against 27 of the agents for failure to repay their monthly subsidies as required by the terms of an addendum to the AAA.

{¶ 11} With Appellees' motion to strike pending, the agents filed a notice of appeal to this court on January 20, 2015, challenging the trial court's decision of December 2,

2014, on Appellees' motion to dismiss.[5] The trial court sustained Appellees' motion to strike in its decision of February 6, 2015, and on March 11, 2015, Appellees filed a second motion to dismiss, seeking dismissal of the agents' claims for "fraud[ulent] [inducement] and unjust enrichment" to the "extent [those claims were] not previously dismissed." Defendants' Second Motion to Dismiss 1, Mar. 11, 2015.

{¶ 12} In Montgomery App. No. 26559, we dismissed the agents' appeal for want of a final, appealable order on April 7, 2015. Two days later, Appellees moved for summary judgment on the agents' claims under R.C. Chapter 1334. On May 6, 2015, the trial court held Appellees' second motion to dismiss in abeyance, and in a decision entered on May 21, 2015, it sustained Appellees' motion for summary judgment. The court sustained Appellees' second motion to dismiss on November 30, 2015.

{¶ 13} On December 8, 2015, Appellees filed a third motion to dismiss, directed to the agents' claims for breach of contract. The trial court overruled the motion in part with respect to the agents' "breach of contract allegations related to [Appellees]' alleged failure to make available education and sales training programs and failure to pay commissions in accordance with established commission schedules and rules." Decision, Order and Entry on Defendants' Third Motion to Dismiss 14, Feb. 23, 2016. In "all other respects," the court sustained the motion. *Id.*

{¶ 14} On October 31, 2016, Appellees moved for summary judgment on their counterclaim against 27 of the agents for failure to repay subsidies. The trial court sustained the motion in part and overruled the motion in part in a decision entered on

---

[5] The agents contended, implicitly, that their notice was timely because the trial court's decision of December 2, 2014, did not become final until they filed their notice of voluntary dismissal on December 22, 2014.

February 7, 2017.

{¶ 15} On October 10, 2017, Appellees moved for summary judgment on the remainder of the agents' claims for breach of contract, as well as their counterclaim against 27 of the agents, to the extent that the counterclaim had not been resolved by the trial court in response to Appellees' previous motion. The agents filed a reciprocal motion for summary judgment on Appellees' counterclaim on the same date. On December 17, 2017, the trial court overruled the agents' motion, and on March 12, 2018, the court sustained Appellees' motion in part and overruled the motion in part.

{¶ 16} In April 2018, the case proceeded to a trial by jury on the claim of Appellant, Glenn Kamphaus, for breach of contract with respect to Appellees' alleged failure to pay commissions, and on Appellees' counterclaim against Kamphaus for failure to repay his subsidies. The trial court directed a verdict in favor of Appellees on Kamphaus's claim against them, and the jury entered a verdict in favor of Kamphaus on Appellees' counterclaim against him.

{¶ 17} On May 9, 2018, the trial court entered its final judgment, incorporating the foregoing verdicts. The court further entered judgment in favor of Appellees on their counterclaim for failure to repay subsidies as it related to 11 of the agents. Appellants timely filed their notice of appeal to this court on May 30, 2018.

## II. Analysis

{¶ 18} We address Appellants' first and second assignments of error together because both of the assignments relate to the trial court's dismissal of Appellants' cause of action for fraudulent inducement. For their first assignment of error, Appellants contend that:

THE APPELLANTS' COMPLAINT STATED VIABLE AND SPECIFIC CLAIMS FOR FRAUDULENT INDUCEMENT[,] AND THE TRIAL COURT'S DISMISSAL OF THOSE CLAIMS WAS ERROR.

And for their second assignment of error, Appellants contend that:

THE APPELLANTS' FRAUD ALLEGATIONS WERE SUFFICIENTLY SPECIFIC UNDER CIV.R. 9(B), PARTICULARLY GIVEN THE NUMBER OF PLAINTIFFS AND THE MULTIPLE LEVELS OF CORPORATE DEFENDANTS.

{¶ 19} Appellants argue that the trial court erred by dismissing their claims against Appellees for fraudulent inducement. In its decisions of December 2, 2014, and November 30, 2015, the court dismissed the claims pursuant to Civ.R. 12(B)(6) because it determined that Appellants could not prove their allegations of fraud without relying on evidence excluded by the parol evidence rule, and because it determined that the allegations were insufficient for purposes of Civ.R. 9(B). Appellants maintain, to the contrary, that the parol evidence rule was inapplicable to their claims, and that their allegations of fraud were sufficiently particular. Appellant's Brief 2-15.

{¶ 20} A motion to dismiss pursuant to Civ.R. 12(B)(6) "is [a] procedural [motion that] tests the sufficiency of [a] complaint" as a matter of law. *See State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.*, 65 Ohio St.3d 545, 548, 605 N.E.2d 378 (1992). When a court considers a motion to dismiss, it "must presume that all factual allegations of the complaint are true and make all reasonable inferences in favor of the non-moving party." (Citations omitted.) *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988). Given the purpose of a motion to dismiss, the moving party "may not rely on

allegations or evidence outside the complaint." *Hanson* at 548.

**{¶ 21}** Dismissal under Civ.R. 12(B)(6) is warranted only if the plaintiff can prove no set of facts in support of the claim or claims asserted in the complaint that would entitle the plaintiff to the relief requested. *See Ohio Bur. of Workers' Comp. v. McKinley*, 130 Ohio St.3d 156, 2011-Ohio-4432, 956 N.E.2d 814, ¶ 12, citing *O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242, 245, 327 N.E.2d 753 (1975), and *LeRoy v. Allen, Yurasek & Merklin*, 114 Ohio St.3d 323, 2007-Ohio-3608, 872 N.E.2d 254, ¶ 14; *see also Sacksteder v. Senney*, 2d Dist. Montgomery No. 24993, 2012-Ohio-4452, ¶ 35-46. Appellate "review of a trial court's decision [on a motion] to dismiss * * * pursuant to Civ.R. 12(B)(6) is de novo." (Citation omitted.) *McKinley* at ¶ 12.

## A. The Parol Evidence Rule

**{¶ 22}** Appellants' first assignment of error concerns the trial court's application of the parol evidence rule, a principle "of substantive law" that, "when applicable, defines the limits of a contract." *Charles A. Burton, Inc. v. Durkee*, 158 Ohio St. 313, 109 N.E.2d 265 (1952), paragraph one of the syllabus. According to the rule, absent "claims of fraud, mistake, or some other invalidating cause, [a] written agreement may * * * not be varied, contradicted, or supplemented by or on account of evidence of prior or contemporaneous oral agreements, or by [subsidiary] written agreements that the terms of the principal contract do not expressly authorize." *Evilsizor v. Becraft & Sons Gen. Contrs., Ltd.*, 156 Ohio App.3d 474, 2004-Ohio-1306, 806 N.E.2d 614, ¶ 12 (2d Dist.), citing *Galmish v. Cicchini*, 90 Ohio St.3d 22, 27-28, 734 N.E.2d 782 (2000). The rule, regardless, "does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement." *Simon Property Group, L.P. v. Kill*, 3d Dist. Allen No. 1-09-30,

2010-Ohio-1492, ¶ 15, citing *Galmish* at 28. Yet, in a further convolution, the "rule may not be avoided 'by [means of] a fraudulent inducement claim [premised on the allegation] that the inducement to [execute a written contract] was a promise, the terms of which are directly contradicted by the signed writing.' " *Galmish* at 29, quoting *Marion Prod. Credit Assn. v. Cochran*, 40 Ohio St.3d 265, 533 N.E.2d 325 (1988), paragraph three of the syllabus. Thus, an oral agreement, or a subsidiary written agreement, "cannot be enforced in preference to a signed writing which pertains to exactly the same subject matter [but states] different terms." *Id.*

{¶ 23} Here, pursuant to the AAA, Appellants "accept[ed] appointment[s] as * * * [agents] for [Appellees]" in particular districts. [6] *See, e.g.*, Answer to Amended Complaint, Ex. 2. The AAA obligated Appellees to: (1) "pay new business and service commissions or any other commission to [agents] in accordance with commission schedules and rules"; (2) "arrange for Group Life and Comprehensive Medical Insurance plans and pay a portion of the premium[s] [for agents] elect[ing] to apply for coverage * * *"; (3) "provide approved * * * manuals, forms and policyholder records necessary to carry out the provisions of [the agreement]"; (4) "provide advertising assistance"; and (5) "make * * * education and sales training programs" available to agents. *Id.* Appellants, in return, were obligated to: (1) "sell insurance exclusively for [Appellees]"; (2) "provide the facilities necessary to furnish insurance services to [Appellees'] policyholders"; (3)

---

[6] Two of the appellees, Farmers Group, Inc. and 21st Century Insurance, were not parties to the AAA and the HMARA. Decision, Entry and Order Sustaining Defendants' Motion for Partial Summary Judgment on Plaintiffs' Counterclaims for Repayment 9, May 21, 2015. We have generally disregarded this distinction in our analysis because it is insignificant for purposes of the issues raised by Appellants.

"permit [Appellees'] authorized representatives * * * to review and examine [agencies']
records [to] verify compliance" with the agreement; (4) "provide a fidelity bond"; (5) "meet
at all times performance standards"; (6) "conduct business in accordance with
[Appellees'] published policies, rules and manuals"; and (7) "comply with all post-
termination obligations" imposed on them [under] [Part] I" of the agreement.   *Id.*

{¶ 24} As well, a series of addenda related to the "Career Agent Program" were
incorporated into the AAA.   *Id.*   Several of these addressed the subsidies that Appellees
were to provide to agents during the 36 months that the agents were enrolled in the
program.   Among other things, the addenda set forth conditions for the payment of the
subsidies; established schedules for the payments; specified the effect that agents'
failures to meet performance standards would have on Appellees' obligations to issue
payments; indicated how agents could become eligible for waivers of their obligations to
repay the subsidies; and specified the effect that the termination of the AAA would have
on agents' repayment obligations.   *Id.*

{¶ 25} The HMARA addressed the business relationships among Appellants and
Appellees. [7]   Its provisions required that Appellants market Appellees' products
exclusively for Appellees; stated the terms of Appellants' compensation; restricted the
advertising materials and documents that Appellants could use for business purposes;
indicated that Appellants were to function as independent contractors; recited Appellants'
confidentiality obligations with respect to their use of Appellees' trade secrets and other
proprietary information; and established a number of other terms of the parties'

---

[7] *See supra* note 6.

relationships, such as the circumstances under which the agreement itself would be terminated. *Id.* The AAA and the HMARA also included integration clauses. *Id.*

**{¶ 26}** To prevail on their claims of fraudulent inducement against Appellees, Appellants would have to prove the following elements: " '(1) an actual or implied false representation concerning a fact or, where there is a duty to disclose, concealment of a fact[;] (2) which is material to the transaction; (3) knowledge of the falsity of the representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred; (4) intent to induce reliance on the representation; (5) justifiable reliance; and (6) injury proximately caused by the reliance.' " *Katz, Teller, Brant & Hild, L.P.A. v. Farra*, 2d Dist. Montgomery No. 24093, 2011-Ohio-1985, ¶ 22, quoting *Simon Property Group, L.P. v. Kill*, 3d Dist. Allen No. 1-09-30, 2010-Ohio-1492, ¶ 17; *see also, e.g.*, *Schroeder v. Henness*, 2d Dist. Miami No. 2012 CA 18, 2013-Ohio-2767, ¶ 19 (identifying elements of civil fraud). Regarding the first element, Appellants set forth in Paragraph 77 of their amended complaint a list of false representations that they attribute to Appellees. Appellants alleged that Appellees "knowingly made at least one of the false representations to each" of them. Amended Complaint ¶ 81.

**{¶ 27}** In their brief, Appellants argue that evidence offered to prove that Appellees made these representations should not be excluded by the parol evidence rule because, in asserting their claims of fraudulent inducement, they "are not challenging the terms of the contracts or seeking to reform them," but rather, that they "are claiming that they were induced to sign [the AAA and the HMARA] because of false and misleading promises and statements." Appellants' Brief 5. Appellees argue in response that, as a result of the integration clause in the HMARA, Appellants cannot avoid application of the parol

evidence rule, because by executing the HMARA, Appellants "specifically agreed" that: (1) "no promises or representations were made other than those set forth" in the HMARA and the AAA; and (2) "there were no 'inducements' upon which [Appellants] relied, other than those" specified in the two agreements.   (Emphasis omitted.)   Appellees' Brief 8.

{¶ 28} Appellants' argument has no merit and amounts to little more than a tautology.   *Compare* Appellants' Brief 5 and 11, *with Galmish*, 90 Ohio St.3d at 29, 734 N.E.2d 782.   On the other hand, Appellees' reliance on the integration clause in the HMARA is largely misplaced because the inclusion of an integration clause "adds nothing to the legal effect" of a written agreement.   *Galmish* at 28.   That is, "the presence of an integration clause makes [a] final written agreement no more integrated than [did] the act of embodying the complete terms into the writing" itself.   *Id.*   Thus, the mere presence of integration clauses in the AAA and the HMARA made these agreements no more integrated than they would have been in the absence of the clauses.

{¶ 29} We find, nevertheless, that most of the allegedly false representations listed by Appellants in their amended complaint were properly excluded by the trial court pursuant to the parol evidence rule.   Specifically, we find that the allegations offered by Appellants in Paragraphs 77(a) and (e)-(o) of the amended complaint pertain directly to the same subject matter covered by the AAA and the HMARA, but in contradictory terms.

{¶ 30} In Paragraph 77(a), Appellants allege that Appellees "falsely represented that the goal of the [Agency Point] Program was to increase [Appellees]' market share in Ohio."   The HMARA indicated that Appellants were being "made [agents] for the purpose of furthering the business of [Appellees]."   *See, e.g.*, Answer to Amended Complaint, Ex. 2.   This statement of purpose is essentially the equivalent of the allegedly false

representation about the "goal of the [Agency Point] Program," though the terms vary.

{¶ 31} Appellants also allege in Paragraph 77(a) that Appellees falsely represented that their "insurance products would be competitively priced to achieve [the] goal" of increasing their market share. Although neither the AAA nor the HMARA expressly addressed "pricing," the HMARA announced that Appellees were seeking "to enter into and conduct certain business(es) [sic] that <u>may</u> be made available to [agents]," and it required that agents submit to Appellees "every request or application for [any of Appellees'] products or services" that agents might receive from prospective customers. (Emphasis added.) *See, e.g.*, Answer to Amended Complaint, Ex. 2. Thus, Appellees reserved discretion to themselves to choose which of their products they would allow Appellants to sell and, concomitantly, the discretion to set the conditions on which the products could be sold. The allegedly false representation about the "pricing" of products, then, directly pertains to the same subject matter covered in the HMARA, but on different terms.

{¶ 32} In Paragraph 77(e), Appellants allege that Appellees "falsely represented that they would provide adequate support for [agents] by providing customer service representatives and life and commercial product specialists to assist [agents] in building their business[es] and meeting their sales goals." This alleged representation covers the same ground as Part A of the AAA, in which Appellees were obligated to provide agents with "advertising assistance," along with "education and sales training programs," and Part B of the AAA, in which Appellants, as agents, were obligated to "provide the facilities necessary to furnish insurance services to all policyholders," including "collecting and promptly remitting" policy premiums to Appellees and "receiving and adjusting claims

within [agents'] authority." *See, e.g., id.* Under the HMARA, for that matter, agents were obligated to "solicit, offer, sell and service those products and services" offered by Appellees. *See, e.g., id.* These contractual provisions relate to the same subject as the alleged false representation, but the representation conflicts with the foregoing contractual provisions by referring to more extensive obligations on Appellees than the contracts actually impose.

**{¶ 33}** In Paragraph 77(f), Appellants allege that Appellees "falsely represented that [agents] would have access to current and viable sales leads." Appellees obligated themselves in the HMARA "to allow [agents] to use [their] policyholder information pertaining to [agents'] customers to offer products or perform services in connection with [such] business" as Appellees chose to make "available to [agents] under [the] [a]greement." *See, e.g.*, Answer to Amended Complaint, Ex. 2. The alleged representation relates to Appellants' use of Appellees' customer data, but the representation contradicts the corresponding provisions of the HMARA because it purportedly included an assurance of utility.

**{¶ 34}** In Paragraph 77(g), Appellants allege that Appellees "falsely represented and mischaracterized the subsidy payments" that agents were to receive and "misled [them] regarding the payback provisions and terms of the subsidy," and in Paragraph 77(h), Appellants allege that Appellees "failed to disclose the fees and expenses that were [to be] automatically deducted from [agents'] monthly subsidy payment[s]." The essence of these allegations is that Appellees provided an incomplete and misleading description of the subsidy, but the AAA and its addenda disclosed the applicable terms.

**{¶ 35}** In Paragraph 77(i), Appellants allege that Appellees "falsely represented

[the] incentives [being offered to] [a]gents for meeting quotas." Part H of the AAA referred to "various bonus programs" that might be made available to agents, stating that the "terms and conditions [of such programs] [were] subject to change at any time." *See, e.g.*, *id.* The HMARA stated, somewhat less equivocally, that agents were to "be paid for services rendered in accordance with schedules [which would be] periodically published" by Appellees, adding that Appellees could "unilaterally amend the schedule(s) [sic] of compensation." *See, e.g.*, *id.* The contracts thus applied to the same subject matter as the allegedly false representation, but the contracts differ inasmuch as they indicated that the terms of Appellants' compensation were not fixed.

{¶ 36} In Paragraph 77(j), Appellants allege that Appellees "falsely represented that the performance and production targets were reasonable, when in fact[,] [the targets] were unreasonable and unsustainable." Part B of the AAA required agents to "meet * * * any specific performance standards [set by Appellees] in their sole discretion" at "all times." (Emphasis added.) *See, e.g.*, Answer to Amended Complaint, Ex. 2. The HMARA theoretically required that agents "meet any and all minimum production and expectation standards that [were], or [might have been], contained" in the agreement, though it did not actually set forth any such standards. *See, e.g., id.* Even so, Appellants' allegation directly pertains to the provisions of the two contracts; although the AAA ostensibly invested Appellees with absolute discretion to designate standards, regardless of whether the standards were qualitatively "reasonable," the allegedly false representation conflicts with the contractual language because the representation implies at least some limitation on Appellees' discretion.[8]

---

[8] The question of whether Appellees, as a matter of Ohio law, could have exercised

{¶ 37} In Paragraph 77(k), Appellants allege that Appellees "falsely represented that after three years in the [Agency Point] Program the production targets would terminate[,] and [agents] would [then] own their own book[s] of business." As noted, provisions of the AAA and the HMARA relate directly to performance standards, but contrary to the allegedly false representation in Paragraph 77(k), the agreements did not establish a date after which the standards would no longer apply. Furthermore, neither of the agreements had a fixed, overall duration. The AAA stated that it would "continu[e] until terminated by either party," and the HMARA indicated only that it would be "automatically terminate[d] upon the effective termination date of [the AAA]." *See, e.g.*, Answer to Amended Complaint, Ex. 2.

{¶ 38} Similarly, neither the AAA nor the HMARA refers expressly to agents' "book[s] of business," but the alleged representation is contradictory to terms in both of the agreements to the extent that Appellees retained ownership of customers' contact information. For instance, the HMARA stated that Appellees would "own certain information relative to the operation of [agents] under the aforementioned and applicable [AAA], * * *, including without limitation, * * *, all information obtained by [agents] from current and prospective customers." *See, e.g.*, *id.* Appellants, furthermore, were obligated "not to use [Appellees' customer data] in any other business or capacity" during

---

absolute discretion without violating the implied duty of good faith and fair dealing is not before us, though the violation of the implied duty of good faith would presumably constitute a breach of an executory contract, rather than fraudulent inducement to enter into a contract. *See, e.g.*, *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443-444, 662 N.E.2d 1074 (1996) (describing the contractual duty of good faith as "a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting").

"the term [of the agreement] and thereafter." *See, e.g., id.* Likewise, upon termination of the AAA, Part J required that Appellees' customer data "be returned immediately." *See, e.g.*, *id.*

{¶ 39} In Paragraph 77(l), Appellants allege that Appellees "falsely represented that certain leads and contacts that it provided to [agents] were of high quality[,] such that [agents] would be able to meet their sales goal[s] and quotas by using those leads." The HMARA obligated Appellees "to allow [agents] to use [their] policyholder information pertaining to [agents'] customers to offer products or perform services in connection with [such] business" as Appellees "made available to [agents] under [the] [a]greement." *See, e.g.*, *id.* This allegation relates to Appellants' use of Appellees' customer data, but like the allegation in Paragraph 77(f), it conflicts with the HMARA because it includes an assurance of utility not found in the corresponding contractual language.

{¶ 40} In Paragraph 77(m), Appellants allege that Appellees "falsely represented that certain 'AMP' leads were required to be purchased." Appellants fail to define the term " 'AMP' leads," but this allegedly false representation, like the allegedly false representations in Paragraphs 77(f) and (l), conflicts with pertinent provisions of the HMARA. Although Appellees were obligated under the HMARA "to allow [agents] to use [their] policyholder information * * * to offer products or perform services" for existing or prospective customers, the agreement also established that agents "ha[d] no rights to or ownership" in such information, which is inconsistent with the allegation that Appellees told Appellants that they were required to purchase " 'AMP' leads." *See, e.g.*, *id.*

{¶ 41} In Paragraph 77(n), Appellants alleged that Appellees "promised to assign 'orphan' policies and the proceeds therefrom to [agents] as those policies became

available within [agents'] geographic market[s]." According to the HMARA, Appellees were seeking "to enter into and conduct certain business(es) [sic] that <u>may</u> be made available to [agents]," which is incompatible with the substance of the allegedly false representation. (Emphasis added.) *See, e.g.*, *id.*

{¶ 42} In Paragraph 77(o), Appellants allege that Appellees provided them individually with false information regarding the specific "underwriting and product lines" in which they were interested, as well as false information regarding "the markets they intended to serve." Like the allegedly false representation in Paragraph 77(e), this representation covers the same ground as Part A of the AAA, under which Appellees obligated themselves to provide agents with "education and sales training programs." *See, e.g.*, Answer to Amended Complaint, Ex. 2.

{¶ 43} Conversely, we find that the allegations in Paragraphs 77(b)-(d) should not have been barred pursuant to the parol evidence rule. Neither the AAA nor the HMARA included provisions related to "the success rate for [agents] in the [Agency Point] Program" or the "expected earnings of [agents]," and other than provisions restricting Appellants from engaging in post-termination competition with Appellees in the insurance industry, neither of the agreements included any representation related to Appellants' "open[ing] [of] their own office[s]" or to the financial viability of such independent "insurance agency business[es]."[9] Amended Complaint ¶ 77(b)-(d); *see, e.g.*, Answer to

---

[9] Appellants' exact meaning in Paragraph 77(d) is unclear. If the allegation were intended to refer to the termination of the AAA and the HMARA, then it would have been properly excluded under the parol evidence rule in light of the agreements' provisions on termination, none of which established a specific termination date. For purposes of Civ.R. 12(B)(6), however, we have interpreted the allegation less restrictively.

Amended Complaint, Ex. 2. Appellants' first assignment of error is therefore sustained with respect to the allegations in Paragraphs (b)-(d) of the amended complaint, and overruled with respect to the allegations in Paragraphs (a) and (e)-(o).

## B. The Particularity Requirement of Civ.R. (9)(B)

{¶ 44} In their second assignment of error, Appellants challenge the trial court's finding that the allegations presented in Paragraph 77 were insufficient to satisfy the particularity requirement of Civ.R. 9(B). Appellants' Brief 12. Civ.R. (9)(B) mandates that "all averments of fraud or mistake, [along with] the circumstances constituting fraud or mistake," be "stated with particularity." The rule thus implicates the first and second of the elements of fraud, which together require proof of " 'an actual or implied false representation concerning a fact [material to a proposed transaction], or where there is a duty to disclose, concealment of [such] a fact.' " *See Katz, Teller, Brant & Hild*, 2d Dist. Montgomery No. 24093, 2011-Ohio-1985, at ¶ 22, quoting *Simon Property Group*, 3d Dist. Allen No. 1-09-30, 2010-Ohio-1492, at ¶ 17. To fulfill the requirements of the rule, the plaintiff must also: (1) specify the content of any allegedly false statements; (2) state "the time and place" where such statements were made; and (3) identify the defendant who allegedly made the statements. (Citation omitted.) *Schroeder*, 2d Dist. Miami No. 2012 CA 18, 2013-Ohio-2767, at ¶ 19.

{¶ 45} Although we agree with the trial court's determination that Appellants' claims of fraud failed to satisfy Civ.R. 9(B), we find that the court erred by dismissing the claims with prejudice pursuant to Civ.R. 12(B)(6). The dismissal of a claim should be "without prejudice except in those cases where the claim cannot be pleaded in any other way." *Fletcher v. Univ. Hosps. of Cleveland*, 120 Ohio St.3d 167, 2008-Ohio-5379, 897

N.E.2d 147, ¶ 17, citing *Collins v. Natl. City Bank*, 2d Dist. Montgomery No. 19884, 2003-Ohio-6893, ¶ 51. To the extent that Appellants' claims were based on the allegations set forth in Paragraphs 77(b)-(d) of the amended complaint, which are not excluded under the parol evidence rule, Appellants could theoretically state claims in satisfaction of Civ.R. 9(B) by filing an amended complaint in which they supplement their allegations. As a result, Appellants' second assignment of error is sustained in part with respect to the allegations in Paragraphs (b)-(d) of the amended complaint, and overruled in part with respect to the allegations in Paragraphs (a) and (e)-(o).

{¶ 46} For their third assignment of error, Appellants contend that:

THE TRIAL COURT ERRED IN GRANTING DEFENDANTS' [sic] MOTION TO DISMISS APPELLANTS' CLAIMS FOR BREACH OF CONTRACT.

{¶ 47} Appellants' claims for breach of contract were adjudicated by way of the trial court's rulings on Appellees' third motion to dismiss, filed by Appellees on December 8, 2015; the motions for summary judgment filed by Appellees on October 31, 2016, and October 10, 2017; and in the case of Appellant, Glenn Kamphaus, through the court's entry of a directed verdict at trial.[10] Rather than challenging any specific ruling made by the trial court, Appellants offer two general arguments in their brief. First, Appellants

---

[10] In its decision of February 23, 2016, the trial court dismissed all of Appellants' claims for breach of contract pursuant to Civ.R. 12(B)(6), except as the claims "related to [Appellees]' alleged failure to [provide] education and sales training programs" and as they related to Appellees' alleged "failure to pay commissions [as required by the parties'] established schedules and rules." Decision, Order and Entry on Defendants' Third Motion to Dismiss 14. The trial court entered summary judgment on the balance of the claims in favor of Appellees under Civ.R. 56 in its decisions of February 2, 2017, and March 12, 2018.

argue that the court erred by dismissing their claims for breach of contract in light of the limitations imposed on discovery by the court itself, and second, Appellants argue that the court erred by disregarding their claims that Appellees breached the terms of oral agreements extrinsic to the AAA and the HMARA. *See* Appellants' Brief 17-19.

**{¶ 48}** In contrast to a motion to dismiss under Civ.R. 12(B)(6), the entry of summary judgment under Civ.R. 56 "is proper when: (1) a case presents no genuine dispute as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) construing the evidence most strongly in favor of the non-moving party, reasonable minds can reach only one conclusion, which is adverse to the non-moving party." *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978); *Dalzell v. Rudy Mosketti, L.L.C.*, 2d Dist. Clark No. 2015-CA-93, 2016-Ohio-3197, ¶ 5, citing *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998). The substantive law of the claim or claims being litigated determines whether a fact is "material." *Herres v. Millwood Homeowners Assn., Inc.*, 2d Dist. Montgomery No. 23552, 2010-Ohio-3533, ¶ 21, citing *Hoyt, Inc. v. Gordon & Assocs., Inc.*, 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995).

**{¶ 49}** Initially, the movant bears the burden of establishing the absence of any genuine dispute of material fact. *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988). The movant may rely only on evidence of the kinds listed in Civ.R. 56(C) for this purpose. *Dalzell* at ¶ 5, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the movant meets its burden, then the non-moving party bears a reciprocal burden to establish, as set forth in Civ.R. 56(E), that the case presents one or more genuine issues of fact to be tried. *Id.* at ¶ 6. The non-moving party, in satisfying

this requirement, may not rely merely upon the allegations or denials offered in the pleadings, but like the movant, "must be able to point to evidentiary materials of the type listed in Civ.R. 56(C)." *Dresher* at 293, quoting Civ.R. 56(E); *Dalzell* at ¶ 6. On appeal, a trial court's ruling on a motion for summary judgment is reviewed de novo. *Dalzell* at ¶ 6, citing *Schroeder*, 2d Dist. Miami No. 2012 CA 18, 2013-Ohio-2767, at ¶ 42.

{¶ 50} Appellants argue, first, that "[w]ithout access to [copies of the addenda to the AAA] and other relevant documents," they "were at a disadvantage" in responding to Appellees' motions to dismiss and Appellees' motions for summary judgment. *Id.* at 17. Yet, Appellants offer no challenge to the trial court's discovery orders, meaning that the question of whether the trial court erred in its rulings on discovery is not before us, but even otherwise, Appellants' argument lacks merit. In its decision of February 2, 2016, the trial court expressly refused to dismiss Appellants' claims for breach of contract on the basis of Civ.R. 12(B)(6) because discovery had been limited to that point in the case; its subsequent entry of summary judgment in favor of Appellees on these claims was premised on Appellants' own failures to respond to Appellees' motions with affidavits or other summary judgment evidence, as required by Civ.R. 56.[11]

{¶ 51} In their second argument, Appellants posit that their claims for breach of contract also arose from a series of promises allegedly made by Appellees "[a]s part of recruitment, and during training," that "were generally oral and supplementary to the contracts executed [i.e. the AAA and the HMARA] when agents entered the [Agency

---

[11] Appellants likewise offer no discussion specifically directed to the trial court's entry of a directed verdict in favor of Appellees on the claim of Appellant, Glenn Kamphaus, for breach of contract.

Point] Program." Appellants' Brief 18. This argument, too, lacks merit because Appellants offered no such allegations in their amended complaint. *See* Amended Complaint ¶ 76 and 87-101. Absent any allegations of this kind, Appellants did not state any cognizable claims for breach of contract based on "oral and supplementary" promises. Appellants' third assignment of error is overruled.

{¶ 52} For their fourth assignment of error, Appellants contend that:

THE AGENCY POINT PROGRAM WAS A "BUSINESS OPPORTUNITY PLAN," AND THE TRIAL COURT'S DECISION TO DISMISS THE APPELLANTS' CLAIMS IN THE FACE OF QUESTIONS OF FACT WAS ERROR.

{¶ 53} In its decision of May 21, 2015, the trial court entered summary judgment in Appellees' favor on Appellants' claims under R.C. Chapter 1334. Appellants maintain that the AAA and the HMARA were subject to the provisions of the chapter, and they argue accordingly that the trial court erred by finding that Appellees were exempt pursuant to R.C. 1334.12(L).

{¶ 54} R.C. Chapter 1334 governs business opportunity plans. A "business opportunity plan" is defined by R.C. 1334.01(D) as "an agreement in which a purchaser obtains the right to offer, sell, or distribute goods or services under all" of three conditions set forth in R.C. 1334.01(D)(1)-(3). Under R.C. 1334.01(A) and 1334.12(L), the provisions of "R.C. 1334.01 [through] R.C. 1334.15 do not apply" to a party "who sells or leases a business opportunity plan" where the party: (1) has either a "net worth * * * of not less than [15] million dollars" on "a consolidated basis," as demonstrated by "its most recent audited financial statement," or a net worth "of not less than one million dollars," if

it is "at least [80] percent owned by a corporation" whose net worth satisfies the foregoing; and (2) "during the five-year period immediately preceding the sale or lease of the [purported] business opportunity plan [at issue]," either "[h]ad at least [25] purchasers conducting business at all times," or itself "conducted the business which is the subject of the * * * plan continuously for not [fewer] than five years preceding the sale or lease of the * * * plan."

{¶ 55} The trial court noted that, in support of their motion for summary judgment, Appellees submitted unrebutted evidence showing that Farmers Group, Inc. and 21st Century Insurance were not parties to the AAA or the HMARA and that the rest of the appellees, who were parties to the contracts, had "a net worth in excess of $15 million" and had "been in the business of selling insurance for more than five years." Decision, Entry and Order Sustaining Defendants' Motion for Partial Summary Judgment on Plaintiffs' Counterclaims for Repayment 9, May 21, 2015. On that record, the court observed that the only question presented for its decision was "the purely legal question" of whether the business contemplated in the AAA and the HMARA was "the sale of insurance or the Agency Point Program." (Emphasis omitted.) *Id.* The court found that the subject of the Agency Point Program, as embodied in the AAA and the HMARA, was the sale of insurance.

{¶ 56} We concur with the trial court. Naturally, the two agreements comprise a number of terms directed entirely to the agency relationships among Appellants and Appellees, but the fundamental purpose of each of the agreements was the sale of Appellees' insurance products. For instance, the first of the agents' duties listed in Part B of the AAA was "[t]o sell insurance exclusively for [Appellees]," and the second of the

agents' duties was "[t]o provide the facilities necessary to furnish insurance services to all [of Appellees'] policyholders." *See, e.g.*, Answer to Amended Complaint, Ex. 2. The preamble to the HMARA indicated similarly that the purpose of that agreement was "to appoint [agents] to offer products and perform other services in connection" with the business that Appellees—at least, those who were parties to the agreements—made available to Appellants. *See, e.g.*, *id.* Appellants' fourth assignment of error is overruled.

{¶ 57} For their fifth assignment of error, Appellants contend that:

THE TRIAL COURT'S DECISION TO GRANT DEFENDANTS' [sic] MOTION FOR SUMMARY JUDGMENT AND TO DENY APPELLANTS' MOTION ON THE ISSUE OF THE EFFECT OF THE ISSUANCE OF A FORM 1099 WAS DOUBLE ERROR.

{¶ 58} Appellants' fifth assignment of error concerns Appellees' counterclaims against those of the appellants who did not repay the subsidies they received from Appellees pursuant to the "Career Agent Program Subsidy Addendum," which was attached to the AAA. *See, e.g.*, Answer to Amended Complaint, Ex. 2. Appellants argue that by issuing copies of IRS Form 1099-MISC to those of them who were allegedly in default of their repayment obligations, Appellees cancelled the corresponding debt and, in effect, represented to the IRS that the subsidy payments represented "income [earned] for services rendered." *See* Appellants' Brief 21-22. At trial, Appellants moved for summary judgment on Appellees' counterclaims for repayment of the subsidies, but the court overruled Appellants' motion, finding among other things that the issuance of Form 1099-MISC did not prove that Appellees had cancelled any of the appellants' debts. *See*

Decision, Order and Entry Overruling Plaintiffs' Motion for Partial Summary Judgment 6-8, Dec. 18, 2017.

{¶ 59} Form 1099-MISC makes no reference to the cancellation of debt, in contrast to Form 1099-C, though even Form 1099-C is not, of itself, conclusive evidence that a debt was discharged.[12]  *See, e.g., FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir.2013) (rejecting the premise that Form 1099-C "is prima facie evidence, in and of itself, that [a debt] has been cancelled"); 26 C.F.R. 1.6050P-1(a) (requiring the filing of Form 1099-C on occurrence of certain events "whether or not an actual discharge of indebtedness has occurred").  Although some case law supports the contrary proposition—that the issuance of Form 1099-C is prima facie evidence of a creditor's intent to discharge debt—according to the same precedent, a debtor's reliance on the form merely shifts the burden of persuasion to the creditor to demonstrate that the form was issued by mistake or as a result of a triggering event, other than the discharge of a debt, specified in federal regulations.  (Citations omitted.)  *See Cashion* at 178.

{¶ 60} Here, Appellees submitted an affidavit executed by Charles Woods, who was employed as "Manager, Accounting Field Operations," to explain why they issued copies of Form 1099-MISC.[13]  Affidavit of Charles Woods ¶ 1, Oct. 23, 2017.  In his affidavit, Woods indicated that Appellees issued copies of Form 1099-MISC to those

---

[12] Form 1099-C is captioned "Cancellation of Debt" and includes fields for reporting the name of the creditor, the name of the debtor, and the amount of "debt discharged."  Form 1099-MISC is captioned "Miscellaneous Income" and includes fields for reporting the name of the payer, the name of the recipient, and the amounts paid.  Among other things, Form 1099-MISC may be used to report the cancellation, forgiveness or settlement of at least $600.

[13] Appellees attached the affidavit as an undesignated exhibit to their memorandum in opposition to the motion for summary judgment filed by Appellants on October 10, 2017.

agents who had not repaid their subsidies and were deemed unlikely to do so, adding that if an agent thereafter repaid the subsidy, Appellees would issue a corrected copy of the form. *See id.* at ¶ 3-4. Woods averred further that "the amounts of outstanding subsidy loan obligations" were "reported on the 1099s as 'other income,' " as opposed to discharged debt; presumably, Appellees issued the form in such circumstances with the intention of claiming the outstanding subsidies as losses for tax purposes. *See id.* at 3 and 5.

{¶ 61} We find, as the trial court determined, that Appellees' issuance of Form 1099-MISC did not establish, as a matter of law, that Appellees were cancelling the debts of those appellants who did not repay their subsidies. Even accepting that the forms of themselves could have been construed as evidence of Appellees' intent to cancel the debts, Woods's affidavit testimony indicated unequivocally that Appellees did not intend to cancel the debts of those of the appellants who defaulted on their repayment obligations. We find, therefore, that the court did not err by overruling Appellants' motion for summary judgment on Appellees' counterclaims against those of the appellants who did not repay the subsidies. Appellants' fifth assignment of error is overruled.

{¶ 62} For their sixth assignment of error, Appellants contend that:

THE TRIAL COURT ERRED BY STRIKING APPELLANTS [sic] VOLUNTARY NOTICE OF DISMISSAL WHERE THE VOLUNTARY DISMISSAL FOLLOWED THE DISMISSAL OF LESS [sic] THAN ALL OF APPELLANTS [sic] CLAIMS BY THE COURT UNDER CIV.R. 12(B)(6).

{¶ 63} As we noted in our summary of the background, the trial court entered a decision on December 2, 2014, in which it partly sustained the first of several motions to

dismiss filed by Appellees. The agents then attempted to dismiss the balance of their claims, filing a notice of voluntary dismissal under Civ.R. 41(A) on December 22, 2014. Appellees moved to strike the notice, citing among other things, the Ohio Supreme Court's opinion in *Pattison v. W.W. Grainger, Inc.*, 120 Ohio St.3d 142, 2008-Ohio-5276, 897 N.E.2d 126. The trial court sustained the motion to strike in its decision of February 6, 2015. Here, Appellants argue that the trial court erred by striking their notice of voluntary dismissal because the resulting limitation on a plaintiff's "right to a voluntary dismissal, * * * creates an anomaly whereby a plaintiff could be forced to pursue claims against a defendant[,] following a partial dismissal under Civ.R. 12(B)(6)[,] unless the plaintiff dismissed the claims with prejudice."

{¶ 64} In Appellants' first appeal, we ruled on the same issue and affirmed the trial court's decision sustaining Appellees' motion to strike. We decline to revisit our reasoning in that case and, for the same reasons, we reiterate that the trial court did not err by sustaining Appellees' motion to strike. Appellants' sixth assignment of error is overruled.

### III. Conclusion

{¶ 65} We find that the trial court erred by excluding evidence, pursuant to the parol evidence rule, in support of the allegations made by Appellants in Paragraphs 77(b)-(d) of the amended complaint, and that the court erred further by dismissing Appellants' corresponding claims for fraudulent inducement with prejudice under Civ.R. 12(B)(6). Accordingly, the trial court's final judgment of May 9, 2018, is reversed with respect to these issues. Otherwise, the trial court's judgment is affirmed. The case is remanded to the trial court for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

WELBAUM, P.J., concurs.

FROELICH, J., concurring in part and dissenting in part:

{¶ 66} I agree with the majority opinion's disposition of the Appellants' assignments of error with two exceptions.

{¶ 67} First, the Appellants alleged in their fraudulent inducement claim that the Appellees falsely represented that the Appellees' insurance products "would be competitively priced" (Paragraph 77(a)) and that the performance and production targets "were reasonable" (Paragraph 77(j)). In my view, these statements, although related to the business relationship between the Appellants and Appellees, do not fall within the scope of any term in the AAA or HMARA. Accordingly, I would conclude that the trial court erred in finding that these additional claims were barred by the parol evidence rule and in dismissing them with prejudice.

{¶ 68} Second, with respect to the Appellants' claim under the Business Opportunity Purchaser's Protection Act, the statute defines a "business opportunity plan" as "an agreement in which a purchaser obtains the right to offer, sell, or distribute goods or services under all" of three conditions set forth in R.C. 1334.01(D)(1)-(3). "The definitional language of R.C. 1334.01(D) alone, however, provides only half the story. To fully understand what a covered 'business opportunity plan' is, the exemptions found in R.C. 1334.12 and R.C. 1334.13 must also be thoroughly explored." Mark Wiseman, *Ohio Consumer Law* § 8:3 (Sept. 2018 Update). "Without these exemptions, the Ohio Business Opportunity Purchasers Protection Act would arguably apply to virtually every

commercial transaction." *Id.* at 8:8.

{¶ 69} R.C. 1334.12 provides 14 complete exemptions to the applicability of the statute.[14] Of relevance, the Act does not apply to a seller who has both:

(1)(a) A net worth on a consolidated basis, according to its most recent audited financial statement, of *not less than fifteen million dollars*;

* * *

(2) Had at least twenty-five purchasers conducting business at all times during the five-year period immediately preceding the sale or lease of the business opportunity plan, or *has conducted the business which is the subject of the business opportunity plan continuously for not less than five years preceding the sale or lease of the business opportunity plan*.

(Emphasis added.) R.C. 1334.12(L).

{¶ 70} The exemption set forth in R.C. 1334.12(L) has been described as a "big company" exemption. Stanley M. Dub, *What's In a Name? State Business Opportunity Statutes as Franchise Disclosure Laws*, 38-SUM Franchise L.J. 105, 111 (2018). It exempts companies that meet a threshold net worth and either have "had at least twenty-five franchises in operation at all times in the previous five years," or have themselves "conducted the business continuously for the previous five years." *Id.* at fn. 29.

{¶ 71} The trial court did not determine whether the Agency Point Program was a "business opportunity plan." Rather, it held, as a matter of law, that the "business that was the subject of the Agency Point Program" was insurance, and since the Appellees'

---

[14] R.C. 1334.13 identifies circumstances that are "partial exemptions" from the Act, and it is not relevant here.

insurance business had a large enough net worth and had been operating long enough, it was excluded from the business opportunity laws.

{¶ 72} In determining "the business which is the subject of the business opportunity plan," the focus should be on what the specific business opportunity plan involves, not on the general business of the seller of the business opportunity plan. In this case, the focus should be not only on the insurance product sold, but also on the structure of the business relationship between the Appellees and the Appellees. It is undisputed that the Appellees have been selling insurance through licensed agents for more than 30 years. It is also undisputed that the Agency Point Program broadly involves the selling of insurance by the agents. However, assuming that the Agency Point Program is a specific business opportunity plan,[15] the Appellees have offered no evidence that the business model under which the Appellants were recruited, trained, assisted with their independent businesses, and paid had been used by Appellees for not less than five years before the Appellants joined the Agency Point Program. Notably, the Appellees did not offer evidence as to how the contracts signed by the Appellants were similar (or dissimilar) to those signed by agents prior to the creation of the Agency Point Program. In other words, the Appellees did not establish that they had conducted the specific business which was the subject of the Agency Point Program continuously for not less than five years preceding the sale or lease of the business opportunity plan to the

_____

[15] Although the Appellees generally denied in their summary judgment memorandum that the Agency Point Program was a business opportunity plan, they did not discuss the statutory definition of a business opportunity plan or ask for summary judgment on the ground that the Agency Point Program did not meet the statutory definition. Because the trial court did not address the issue, any question as to whether the Agency Point Program meets the definition of a business opportunity plan under R.C. Chapter 1334 is not before us.

Appellees.

{¶ 73} I would conclude that the trial court erred when it granted summary judgment to the Appellees, as a matter of law, under R.C. 1334.12(L), sustain the fourth assignment of error, and remand for further proceedings on this claim.

Copies sent to:

Gilbert J. Gradisar
John M. Gonzales
Melvin D. Weinstein
Loriann E. Fuhrer
Hon. Mary L. Wiseman